THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WALTER WRIGHT, Defendant-Appellant.

First District (5th Division)   No. 1—92—3216

Opinion filed June 9, 1995.

1034

Rita A. Fry, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan Schierl, and Anne-Marie Wilmouth, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

BACKGROUND

On July 9, 1992, a jury found the defendant-appellant Walter Wright guilty of first degree murder and armed robbery arising from the March 31, 1990, shooting of the victim, Robert Burnett. The

court sentenced the defendant to natural life without parole for the first degree murder conviction and a concurrent term of 30 years' imprisonment for the armed robbery. For the reasons set forth below, the defendant's conviction and sentence are affirmed.

TRIAL

The defendant's trial commenced on July 7, 1992. Chicago police officer James Banks testified that at 5:15 a.m. on March 31, 1990, he was assigned to investigate a man down at 7540 S. Essex. When he arrived at that address, Banks observed the victim lying on his back near the center of the roadway with his front pants pockets turned out. Banks further observed that the victim was dead and that the rear of his head bore a gunshot wound from a medium-sized firearm, possibly .38 or .32 caliber.

Detective Jack Lahey of the Chicago police testified that he met with Officer Banks at the crime scene around 6 a.m. on March 31, at which time he removed the victim's driver's license, which showed his home address as 111 W. Huron in Chicago. Detective Lahey then telephoned Jimette Holmes, the desk clerk of the Wacker Hotel, located at 111 W. Huron, who told him that the victim operated an American United Cab, number 2612. After confirming that the victim was a lessee of that particular taxi, Lahey caused its license plate number to be entered on a national law enforcement computer system as a wanted vehicle.

Deputy Sheriff Dennis Sesna of the Buffalo County, Nebraska, sheriff's office testified that at 11:50 p.m. on March 31, 1990, approximately 19 hours after the victim's body had been discovered in Chicago, he observed an auto parked on the shoulder of Interstate 80 in Buffalo County, Nebraska. That auto was American United Cab 2612, the victim's taxi. Deputy Sesna pulled behind the taxi and requested that his dispatcher check its license plate number. The defendant then exited the taxi and told Sesna that he had pulled over to rest; Sesna instructed the defendant to return to the taxi. A short time later, the dispatcher advised Deputy Sesna that the victim's taxi was wanted in connection with a homicide investigation in Illinois. Sesna then summoned assistance and arrested the defendant.

Chief Deputy Sheriff Richard Larson of the Buffalo County, Nebraska, sheriff's office testified that on March 31, 1990, he was an investigator with that agency and assisted Deputy Sesna subsequent to the defendant's arrest. Chief Deputy Larson recovered a Taurus .38-caliber six-shot revolver from inside a suitcase laid on the back seat of the victim's taxi. That revolver was loaded with five live rounds but the round directly beneath its hammer had been fired.

Subsequent investigation showed that the defendant had purchased that revolver in California in 1980. Chief Deputy Larson further testified that a gunshot residue test had been performed on the defendant's hands but the results were inconclusive. Larson also stated that he took from the defendant a brown leather jacket which he was then wearing.

Investigator Robert Shelbourn of the Nebraska State Patrol recovered samples of what he believed to be dried blood from the driver's seat and the inside of the driver's side front door of the victim's taxi. Based on the position of the stains he observed, Shelbourn opined that if the samples he recovered were in fact human blood, the person who shed it would have been sitting in the driver's seat of the taxi. Investigator Shelbourn also testified that human blood which had not pooled would dry in 15 to 30 minutes.

Detective William Marley of the Chicago police department also testified at trial wherein he related the following statement which the defendant made to him and his partner, Detective Michael Bosco, at the Area Two Detective Division Headquarters in Chicago on April 7, 1990, and later reiterated in the presence of Assistant State's Attorney Laura Morask. This statement had been the subject of an *in limine* motion to suppress which, as shall be discussed later, was denied by the court.

Detective Marley testified that in answer to the defendant's question he told the defendant that the murder which he was investigating occurred around 5 a.m. on March 31, 1990. The defendant then stated that he could not have been responsible for the murder because "by that time he was hitchhiking on the highway." He said that he checked out of a motel at Roosevelt and Michigan in Chicago at about 2:30 a.m. on March 31, walked to the Dan Ryan expressway, and then began hitchhiking toward Wisconsin. A truck driver picked him up and drove him "for quite a long while towards Wisconsin" and eventually "let him off in a rural area."

According to Detective Marley, the defendant told him that he walked a long way after the truck driver dropped him off and that he eventually "found a taxicab parked along the side of the road with its lights out and with keys in the ignition." The defendant then took that taxi and began driving west toward his ultimate destination of California. The defendant stated that he parked on the shoulder of the road so he could sleep but that a policeman told him that he could not park on the interstate and directed him to leave. The defendant did so but several police officers stopped him a short time later and placed him under arrest.

Marley continued that the defendant admitted that the Taurus

revolver recovered by Chief Deputy Larson belonged to him. Marley then told the defendant that the gunshot residue test which Larson said had been performed would reveal whether he had discharged a firearm. The defendant responded that he had fired the Taurus revolver shortly before the Nebraska police arrested him. He stated that he had exited the taxi to urinate and, upon hearing what he believed to be "some sort of a wild animal," he fired one shot into the air.

Dr. Yuksel Konacki, an assistant Cook County medical examiner, performed an autopsy of the victim's body on April 1, 1990. Dr. Konacki opined that the victim died from a single gunshot wound to the head, but he did not recover the bullet or any fragment thereof. The area around the entry wound was discolored, indicating that when "the gun was fired, the muzzle [was] in contact with the skin."

Christine Braun, a forensic serologist with the Chicago police department crime laboratory, testified that she tested a blood standard drawn from the decedent and identified his blood as type O. She then tested the samples which Investigator Shelbourn recovered from the victim's taxi which proved to be dried human blood, consistent with type O. Braun also tested the leather jacket which Chief Deputy Larson took from the defendant and, although no stains were visible, a sensitive chemical test revealed the presence of blood on the left sleeve. However, that test could not reveal the type of that blood.

On July 9, 1992, the jury found the defendant guilty of first degree murder and armed robbery. The State sought the death penalty. In the first phase of the subsequent proceedings, the jury found the defendant eligible for the death penalty. In the second phase, the jury heard testimony from an expert witness for the defendant, Dr. Henry Conroe, a psychiatrist, who opined that in March of 1990, the defendant suffered from a paranoid disorder which may have influenced his behavior on March 31, 1990. The defendant's mother, Alma Robinson, also testified on the defendant's behalf, indicating that the defendant had behaved strangely since November of 1989. The parties stipulated that the defendant had no disciplinary history at Cook County jail. The jury subsequently declined to impose the death penalty.

At the July 30, 1992, sentencing hearing, the parties rested on the evidence adduced at the second phase of the death penalty hearing but presented additional argument. The court stated that it was "in receipt of the pre-sentence report prepared by the Adult Probation Department." The court then sentenced the defendant to natural life imprisonment under section 5—8—1(a)(1)(b) of the Unified

Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(b)) based on its finding that the defendant murdered the victim in the course of an armed robbery.

## MOTION TO SUPPRESS

Prior to trial, the defendant filed a motion *in limine* to suppress the statements he made to Detectives Marley and Bosco and to Assistant State's Attorney Morask on April 7, 1990. At the hearing on the motion to suppress, the defendant played two audio tapes of conversations which he had with Nebraska authorities on April 1 and April 2, 1990, both of which showed that the defendant declined to talk to the authorities and that he requested an attorney.

Detective Marley testified for the State that on April 6, 1990, pursuant to the defendant's signed extradition waiver, he and Detective Bosco picked the defendant up in Nebraska and returned him to Chicago the following day, April 7. When the detectives and the defendant arrived in Chicago, Marley or Bosco telephoned the Cook County State's Attorney's felony review unit and requested that an assistant State's Attorney be sent to assist them. The defendant was placed within an interview room and given cigarettes and candy while they waited for the assistant State's Attorney to arrive. It was during that interval that the defendant made his statement to Detectives Marley and Bosco. The following testimony was elicited from Marley at the motion to suppress hearing to describe the conversation between himself, Detective Bosco, and the defendant immediately preceding the defendant's statement:

"[DETECTIVE MARLEY:] *** [W]e explained to [the defendant] what we were doing calling the State's Attorney and the State's Attorney had approved the charge against him. We explained our procedures to him.

[ASSISTANT STATE'S ATTORNEY:] And then what happened?

[DETECTIVE MARLEY:] He asked me and Detective Bosco what the date of the murder we were investigating was.

[ASSISTANT STATE'S ATTORNEY:] Did you know that date on April 7th, 1990?

[DETECTIVE MARLEY:] Yes.

[ASSISTANT STATE'S ATTORNEY:] *** [A]fter the defendant asked what date the murder was on, what did you respond?

[DETECTIVE MARLEY:] I told him the date that it had occurred and at that point Detective Bosco reread him his rights.

* * *

[ASSISTANT STATE'S ATTORNEY:] You said when you were before asked—you said before the defendant asked what day the

murder was on, you were explaining the procedures you were going to follow?

[DETECTIVE MARLEY:] Yes.

[ASSISTANT STATE'S ATTORNEY:] And do you remember what exactly you told [the defendant]?

[DETECTIVE MARLEY:] We told him that we were calling a State's Attorney to come out who would review the—as much information as we had in the police reports and that the State's Attorney would make the decision as to whether he'd be charged or not.

[ASSISTANT STATE'S ATTORNEY:] When you were advising him of this, Detective Marley, were you questioning him about the facts of the case that you were investigating?

[DETECTIVE MARLEY:] No.

[ASSISTANT STATE'S ATTORNEY:] Why was it that you weren't doing that?

[DETECTIVE MARLEY:] Investigator Larson from the Buffalo County Sheriff's office had informed us that he had declined to make any statement and wanted to talk to an attorney."

On cross-examination, Detective Marley added that he also told the defendant that the assistant State's Attorney would "interview him if he wanted to be interviewed."

Assistant State's Attorney Morask also testified for the State at the hearing on the *in limine* motion to suppress. She stated she met Detectives Marley and Bosco on April 7, 1990, and learned from them that the defendant had initiated a conversation with them even though he had earlier invoked his right to counsel. Morask then spoke with the defendant and

"told him that I had learned from the detectives that he had been in Nebraska and that he had asked for an attorney in Nebraska, but that upon arriving in Chicago, he had inquired of the detectives, I think he had asked the detectives when did this murder occur that he was suppose[d] to have committed. And the detective answered the question and he said it could never, or I couldn't have done it and proceeded to tell him why.

So I told him that I had heard he had asked for an attorney. I wanted to make sure he initiated the conversation with the detective and that he actually wanted to talk to us. And he said yes, I did initiate the conversation with the detective. I wanted to tell him why or where I had been."

On cross-examination, Morask stated that she had written on her felony review folder that "after advising of rights, he again initiated conversation" but did not indicate that the defendant had stated to her that he was in fact the initiator.

The circuit court denied the defendant's motion to suppress, stating, in pertinent part:

"I believe what Detective Marley had stated to [the defendant] when they got back to Area 2 was not really regarding the case itself. They were advising him as to procedures that were about to take place.

\* \* \*

\*\*\*[T]hey mainly gave information-type statements, and it was the defendant who then turned the tide of the conversation to the alleged homicide when he asked what date the murder had occurred on.

I believe at that point he had initiated the conversation in regards to this investigation, and in regards to the allegations surrounding the homicide of [the victim]."

On appeal, the defendant raises the following contentions: (1) that the circuit court erred in allowing into evidence his April 7, 1990, statement at Area Two after he had invoked his right to counsel in Nebraska; and (2) that the circuit court abused its discretion in sentencing him to a term of natural life imprisonment.

OPINION

THE RIGHT TO COUNSEL

The defendant argues that the circuit court erred in denying his *in limine* motion to suppress the statements he made at Area Two because, despite his invocation of his right to counsel in Nebraska, Detective Marley initiated a conversation with him in contravention of the rule set forth in *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880. The defendant points specifically to Detective Marley's statement that an assistant State's Attorney would be coming out "to interview him if he wanted to be interviewed" as a form of indirect questioning. The defendant further maintains that Marley's statement that an assistant State's Attorney "would make the decision as to whether he'd be charged or not" suggested "that by talking [he] might not be charged" and therefore amounted to "the type of impermissible badgering of a defendant into waiving his previously asserted rights which *Edwards* sought to prevent."

The State concedes that the defendant had invoked his right to counsel but responds that the circuit court properly found that the defendant initiated the conversation with the detectives because "[t]he record clearly indicated that the statements made [by the detectives] were statements indicating common decency and in those statements [the detectives] were not attempting to elicit incriminat-

ing information from [the] defendant." The State further responds that even if the circuit court erred in admitting the defendant's statements that error was harmless.

We agree with the State's position that *Edwards v. Arizona* and its progeny do not compel the exclusion of the defendant's April 7, 1990, statements notwithstanding his invocation of his right to counsel in Nebraska. In *Edwards*, police officers discontinued interrogating the petitioner after he requested an attorney but resumed questioning the following day even though he indicated that he did not wish to speak to anyone. (451 U.S. at 478-79, 68 L. Ed. 2d at 382-83, 101 S. Ct. at 1881-82.) At that second interrogation, the petitioner was readvised of the *Miranda* warnings but nevertheless made an admission which was used against him at trial. 451 U.S. at 479-80, 68 L. Ed. 2d at 382-83, 101 S. Ct. at 1882.

In reversing the petitioner's conviction, the Supreme Court held:

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of [the right against self incrimination] cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as [the petitioner], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" (Emphasis added.) 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1995.

In *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830, the respondent, who had already invoked his right to counsel, asked a police officer " 'Well, what is going to happen to me now?' " (462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833.) The officer reminded the respondent that he had requested an attorney and did not have to talk to him unless he desired to do so. The respondent was subsequently readvised of the *Miranda* warnings and eventually made a full confession after taking a polygraph test. 462 U.S. at 1042-43, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833.

In finding that by asking the question, "Well, what is going to happen to me now?" the defendant initiated the conversation with the police, the Supreme Court in *Bradshaw* indicated that a conversation is initiated within the meaning of *Edwards* if the speaker "evinces a willingness and desire for a generalized discussion about the investigation." 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835; accord *People v. Hicks* (1989), 132 Ill. 2d 488, 493, 548 N.E.2d

1042, 1044-45 ("The preliminary inquiry is whether defendant initiated the conversation in a manner evincing a 'willingness and a desire for a generalized discussion about the investigation' ").

However, the Supreme Court in *Bradshaw* pointed out that not every communication from a defendant to the police constitutes an initiation of conversation by the defendant and, conversely, not every communication from the police to a defendant constitutes an initiation of conversation by the police in contravention of *Edwards*. Mutual exchanges of routine information pertaining to the incidents of the custodial relationship will not amount to an initiation of conversation by defendants or the police:

> "While we doubt that it would be desirable to build a superstructure of legal refinements around the word 'initiate' in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." *Bradshaw*, 462 U.S. at 1045, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.

See also *People v. Trotter* (1993), 254 Ill. App. 3d 514, 523-24, 626 N.E.2d 1104, 1110 ("Inquiries by either the defendant or police relating to routine incidents of the custodial relationship are not *Edwards*-type inquiries because they do not represent a desire to open up a more generalized discussion relating directly or indirectly to the investigation").

The burden of proving that a defendant initiated further conversations with the police after previously invoking his right to counsel must be borne by the State. (*Edwards v. Arizona*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85; *People v. Trotter*, 254 Ill. App. 3d at 523, 626 N.E.2d at 1110.) Whether a defendant has in fact initiated a conversation with the police is determined by examining the totality of the circumstances and the circuit court's determination on that issue will not be disturbed unless it is manifestly erroneous. *People v. Allen* (1993), 249 Ill. App. 3d 1001, 1016, 620 N.E.2d 1105, 1115-16; *People v. Gray* (1991), 212 Ill. App. 3d 613, 616, 571 N.E.2d 489, 492.

█ In this case, we cannot say that the circuit court's determination that the defendant, rather than the detectives, initiated the

conversation relating to the murder in question was manifestly erroneous. Detective Marley's statements to the defendant that an assistant State's Attorney would respond to Area Two, review reports, interview the defendant if he so desired, and then ultimately decide whether to charge him are the sort of statements regarding routine incidents of the custodial relationship which do not rise to the level of an initiation of conversation under *Edwards*. See *Oregon v. Bradshaw*, 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830; *People v. Hicks*, 132 Ill. 2d 488, 548 N.E.2d 1042; *People v. Trotter*, 254 Ill. App. 3d 514, 626 N.E.2d 1104.

The record lacks any indication that Detective Marley's statement of the events which would follow their arrival at Area Two was in any way untrue, that it would have been unusual for detectives to place a subject in an interview room pending the arrival of an assistant State's Attorney, that it would have been unusual for an assistant State's Attorney to assist detectives in processing a felony arrest, or that an assistant State's Attorney's approval of the charge in this case would not have been required. In fact, the Chicago police department arrest report prepared after the defendant was taken to Area Two indicates that Assistant State's Attorney Morask approved the charge of first degree murder against the defendant. Thus, the act of advising the defendant of the expected arrival of Morask and the function she was to perform could therefore be viewed as a statement merely designed to apprise him of anticipated custodial events which would not constitute an initiation of conversation by the State.

Contrary to the defendant's contention, there is no compelling evidence establishing that Detective Marley's statement that the assistant State's Attorney ultimately would decide whether to charge him was designed to suggest that if he made a statement he might not be charged, since there was no showing that it was other than a factual statement to explain Morask's presence. Moreover, the defendant's contention is strongly diluted by the fact that Marley contemporaneously advised the defendant that he would not have to speak to the assistant State's Attorney if he did not want to. Thus, while it may have been preferable if Marley had not said anything about the anticipated arrival of the assistant State's Attorney, what he did say fell short of breaching the permissible boundaries set forth in *Edwards* and *Bradshaw*.

Consistent with this conclusion, we also note that Assistant State's Attorney Morask testified at the motion to suppress that the defendant told her that he initiated the conversation relating to the murder. The defendant points to the fact that Morask did not write on her felony review folder that the defendant *said* that he initiated

conversation with the detectives but rather wrote that "after advising of rights, he again initiated conversation."

However, regardless of what the defendant believes Morask's entry on the felony review folder could be interpreted to connote, the circuit court heard her live testimony that the defendant told her that he initiated the conversation with the detectives and apparently found that testimony credible. While the import of the defendant's admission as to who initiated the conversation is diluted by the fact that the term "initiate" is susceptible of more than one meaning and that a given meaning of that word may not equate with its meaning under *Edwards*, that admission is nevertheless of some additional value in determining whether, in the totality of the circumstances, the defendant initiated conversation with the detectives in the constitutional sense of that term.

Even if it had been error to admit the defendant's statement at trial, any such error would have been harmless. A trial error involving a Federal constitutional right will be deemed harmless where the evidence supporting the defendant's conviction is so overwhelming that it can be said to have been harmless beyond a reasonable doubt. See *Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 828; *People v. Ward* (1992), 154 Ill. 2d 272, 344, 609 N.E.2d 252, 283.

■ The State's evidence in this case showed that the defendant was arrested, only 19 hours after the victim's body was discovered, driving the auto which the victim would have been driving at the time of his death. At the time of his arrest the defendant possessed a revolver, admittedly his own, the caliber of which, according to Officer Banks' testimony, was consistent with the probable caliber of the murder weapon. The fact that the defendant's revolver contained one expended round beneath the hammer corresponded with Dr. Konacki's testimony that the victim died from a single gunshot wound. Serologist Braun discovered evidence of blood on the left sleeve of the defendant's leather jacket, and Investigator Shelbourn recovered human blood, consistent with the victim's blood type, from the seat and inner door of the taxi and stated that any blood which had not pooled would have dried shortly after being shed. Given this evidence, the admission of the defendant's statement did not affect the outcome of his trial and therefore any error in admitting it, even of constitutional dimensions, would have been harmless beyond a reasonable doubt.

Moreover, we note that the challenged statement of the defendant denied any involvement in the victim's murder and, although less than compelling, was given by the defendant to reconcile his

claimed innocence with the facts that he was arrested in Nebraska driving the victim's taxi and that he possessed a revolver with one expended round beneath its hammer. As such, the statement added no positive evidence to the State's case and its admission therefore could not have been prejudicial. While the defendant would contend that his statement was prejudicial in that it was unbelievable, we are hard put to conceive of an alternative explanation which would be more believable and yet consistent with the undisputed facts of his possession of both the victim's taxi and the Taurus revolver.

SENTENCING

The defendant finally contends that the sentence of natural life imprisonment which the defendant received was excessive given his age (39 at the time of the offense), his criminal history (one theft conviction and one battery conviction), and the testimony of Dr. Conroe that he suffered from a mental disorder at the time of the offense. The defendant suggests a term of no more than 60 years.

The circuit court sentenced the defendant to natural life imprisonment under section 5—8—1(a)(1)(b) of the Unified Code of Corrections which provides:

"[I]f the court finds that the murder was accomplished by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(b).)

Section 9—1(b)(6) of the Criminal Code of 1961 provides that the death sentence may be imposed when:

"6. the murdered individual was killed in the course of another felony if:

(a) the murdered individual:

(i) was actually killed by the defendant, *** [and]
***

(b) in performing the acts which caused the death of the murdered individual *** the defendant acted with the intent to kill the murdered individual or knew that his acts created a strong probability of death or great bodily harm ***; and

(c) the other felony was one of the following: armed robbery ***." Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6).

Since trial courts can best weigh the factors relevant to sentencing (*People v. Young* (1987), 152 Ill. App. 3d 361, 365, 504 N.E.2d 115, 117-18), reviewing courts will not disturb a sentence absent a showing that the circuit court abused its discretion. (*People v. Wilson* (1991), 143 Ill. 2d 236, 250, 572 N.E.2d 937, 944.) A trial court need

not articulate the process by which it determines the appropriateness of a given sentence. (*People v. Jarrell* (1993), 248 Ill. App. 3d 1043, 1051, 618 N.E.2d 944, 949.) It need not expressly indicate its consideration of mitigating factors and, absent evidence to the contrary, is presumed to have considered mitigating factors brought before it. *People v. Tirado* (1993), 254 Ill. App. 3d 497, 511, 626 N.E.2d 1114, 1125.

Where the sentencing court examines a presentence report, it is presumed that the court considered the defendant's potential for rehabilitation. (*People v. Powell* (1987), 159 Ill. App. 3d 1005, 1011, 512 N.E.2d 1364, 1368; *People v. Shumate* (1981), 94 Ill. App. 3d 478, 485, 419 N.E.2d 36, 42.) The court, however, need not accord greater weight to defendant's potential for rehabilitation than to the seriousness of the crime. *People v. Boclair* (1992), 225 Ill. App. 3d 331, 335-36, 587 N.E.2d 1221, 1224.

■ We cannot say that the trial judge here abused his discretion in sentencing the defendant to natural life imprisonment. The court permissibly predicated this sentence on its explicit finding that "[the victim] was killed during the course of the felony of armed robbery." The court indicated that it had read the presentence report (see *People v. Powell*, 159 Ill. App. 3d 1005, 512 N.E.2d 1364; *People v. Shumate*, 94 Ill. App. 3d 478, 419 N.E.2d 36) and expressly stated that it considered the statutory factors in mitigation. (See *People v. Tirado*, 254 Ill. App. 3d 497, 626 N.E.2d 1114.) The defendant directs us to no indication, and the record does not otherwise reflect, that the judge considered any improper factors in aggravation.

Moreover, the circuit court could have readily predicated a sentence of natural life on the alternative provision of section 5—8—1(a)(1)(b), which permits the imposition of such a sentence where a murder is exceptionally brutal or heinous and indicative of wanton cruelty. In *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344, also a case where a taxi driver was shot to death during an armed robbery, our supreme court defined brutal behavior within the meaning of section 5—8—1(a)(1)(b) as conduct which is " 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' " 88 Ill. 2d at 501, 431 N.E.2d at 353.) The court in *La Pointe* expressly stated that "[section 5—8—1(a)(1)(b)] does not limit the imposition of a sentence of natural life imprisonment to only those murders involving torture or the infliction of unnecessary pain." 88 Ill. 2d at 501, 431 N.E.2d at 353.

Here, where the defendant held the muzzle of his revolver against the victim's head and pulled the trigger, and where the objective of armed robbery could just as easily have been accomplished without

causing any harm, we would not have found sufficient reason to disturb the conclusion that the defendant acted with exceptional brutality indicative of wanton cruelty.

CONCLUSION

For the reasons discussed above, the defendant's conviction and sentence are affirmed.

Affirmed.

McNULTY and T. O'BRIEN, JJ., concur.