FOURTH DIVISION
December 4, 2008

No. 1-07-0782

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 15587 |
| | ) | |
| RAFAEL AYALA, | ) | Honorable |
| | ) | Bertina E. Lampkin, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE O'BRIEN delivered the opinion of the court:

Defendant, Rafael Ayala, appeals his conviction after a bench trial of first degree murder and his sentence of 27 years' imprisonment. On appeal, defendant contends: (1) his trial counsel provided ineffective assistance by failing to file a motion to suppress his statements; and (2) his sentence of 27 years' imprisonment is excessive. We affirm.

Defendant was charged with two counts of first degree murder in the death of victim, Irma Cerritos (Irma). At defendant's bench trial, Officer Louis Martinez testified that on June 14, 2004, at approximately 4:40 a.m., he and his partner were dispatched to the Patio Motel at 6220 N. Lincoln Avenue in Chicago, Illinois. When they arrived, Officer Martinez was met by defendant, who was descending the stairs from the second floor. Officer Martinez asked defendant, in English, whether he was the person who had called the police and defendant responded affirmatively. When Officer Martinez asked defendant why he had called the police, defendant stated that he had just killed his girlfriend in room 29. Officer Martinez then arrested defendant, read him his <u>Miranda</u> rights and placed him in the police car. Officer Martinez's partner, Officer Esquivel, sat with defendant in the car as Officer Martinez and a sergeant who

had just arrived investigated room 29.

Officer Martinez testified that when he approached the room, he saw that the door was wide open. He entered and found Irma lying on the floor between the bed and the wall. There was blood on the wall and on the bed. Irma was covered in the quilt from the bed and showed no signs of life. Officer Martinez called the paramedics and returned to the police car. He again read defendant his Miranda rights. Defendant then stated that he killed Irma because he was jealous and that he used a knife, which he later flushed down the toilet. Defendant was transported to the police station, where Officer Martinez turned defendant over to Detective Fanning.

Officer Martinez testified that at 6:30 a.m. on June 14, 2004, Detective Fanning interviewed defendant with Officer Martinez serving as translator. During the interview, defendant stated that he and Irma had been dating for two years and they had set a date to see a movie on Saturday, June 12. However, when he called her on June 12 to confirm, she did not answer the phone. Defendant stated that he went to the corner of Clark and Wilson Streets and saw Irma sitting in a vehicle with another man. He then left the area. Later that evening, he called Irma again on her cell phone and this time a man claiming to be her boyfriend answered. Defendant informed the man that Irma was his girlfriend and he asked the man to meet him at the corner of Clark and Wilson Streets. Irma called defendant five minutes later, telling him that the man was going to the corner of Clark and Wilson Streets with three other people and they were going to kill defendant. Defendant told Detective Fanning and Officer Martinez that he was enraged and jealous.

Officer Martinez testified that they asked defendant what happened the following day,

Sunday, June 13. Defendant stated that on June 13, he visited his children. Sometime during that visit, defendant went into the kitchen and took a knife, which he hid in his boot. Defendant stated that he took the knife because he was jealous and felt betrayed by Irma, and that he was going to kill her. Defendant had already arranged to meet Irma at the Patio Motel, a place they frequented, after his visit with his children. At the motel, defendant and Irma proceeded to room 29. Inside, defendant hid the knife in the end table by the bed when Irma was not looking, and then the couple had sexual intercourse. Afterwards, defendant questioned Irma about the other man, and she replied that they were just friends and although he was pursuing her, she wanted nothing to do with him.

Officer Martinez testified that they spoke with defendant about what happened next. Defendant stated that Irma fell asleep. While Irma slept, defendant snorted cocaine and returned to the bed. Defendant grabbed her by the neck and held the knife in one hand. Irma awoke and begged defendant for her life, telling him that she loved him. Defendant stabbed her in the neck. As she tried to roll over to escape, defendant stabbed her several times in the back. Defendant then strangled her because he wanted to make sure she was dead. After she died, defendant told her that he loved her, took a shower, and flushed the knife down the toilet. Approximately two hours later, defendant called Irma's sister, Berta, and he also called the police.

Defendant agreed to give a videotaped statement, and, at 3:15 p.m. on June 14, 2004, he gave a similar account to Detective Fanning, Assistant State's Attorney Gambino, and Officer Munoz.

Berta Cerritos testified that she knew defendant as Ruben Malave and that her sister Irma

had dated him for a couple of years. On June 14, 2004, at approximately 4:20 a.m., Berta received a call from defendant in which he said he was sorry for killing Irma. She hung up the phone and called Irma's cell phone. Defendant answered the phone and again told Berta that he had killed Irma. Berta told her husband of her conversation with defendant, and he called 911. Berta then went to Irma's apartment but she was not there.

Kathleen Gahagan testified that she and her partner, Carl Brasic, forensic investigators with the Chicago police department, processed room 29 on June 14, 2004, at approximately 5:15 a.m. Inside, Investigator Gahagan saw blood on the bedding, splattered on the wall, and on Irma, who was covered in bedding. Investigator Gahagan saw a broken cell phone on a desk, and she saw an ashtray containing cigarette butts, a couple of empty Sprite cans and plastic cups on an end table. The investigators collected the physical evidence, including a nine-inch stainless steel knife with a black plastic handle that was retrieved from the toilet. The parties stipulated that testing on the physical evidence found that two of the cigarette filters matched the DNA profile of defendant, with a minor profile being consistent with Irma. Swabs taken from Irma's vagina, mouth and anus contained semen. No blood or fingerprints suitable for comparison were taken from the knife. However, a print taken from the toilet seat matched defendant.

The parties also stipulated that the medical examiner, Claire Cunliffe, performed an autopsy on Irma on June 15, 2004. An external examination revealed that Irma suffered a stabbing injury to the right side of her neck at the base of the skull, and four stab wounds on the left side of her back. Two of those wounds punctured her left lung, causing a hemorrhage into the left chest cavity. Irma also had defensive wounds, stab marks, on her right hand. There was a

partial ring abrasion in the 10 o'clock to 4 o'clock position around her neck, as well as abrasions on her cheeks and a bruise on the right side of her nose. Dr. Cunliffe opined with a reasonable degree of scientific certainty that Irma died from multiple stab wounds and the manner of death was homicide.

Defendant testified that he began dating Irma in 2001 and they moved in together. They stopped living together in 2003 because of jealousy on both sides. He and Irma continued to have sexual relations, however, and they had sex at the Patio Motel at least five times between August 2003 and June 2004. On June 12, 2004, Irma was supposed to call defendant around 3 p.m. to make arrangements to see a movie. Irma did not call defendant at 3 p.m., so he called her but she did not answer the phone. Defendant stated that he called her phone 20 to 30 times between 3 p.m. and 7 p.m. At 7 p.m., a man answered her phone and stated that Irma was his girlfriend. Defendant answered, "she is not your girlfriend, she is my wife for three years." The man stated he had been Irma's boyfriend for a long time. They decided to meet at Clark and Wilson Streets to "resolve the problem." Irma called defendant approximately five minutes later, telling him to leave because the man was calling friends and they were going to kill defendant. Defendant continued to wait for the man at the corner of Clark and Wilson Streets, but he never arrived. Defendant called Berta, who told him that her sister was not worth destroying his life over.

Defendant testified that when the man did not show up at Clark and Wilson Streets, defendant called Irma's cell phone and the man answered again. He told defendant a different location at which to meet him. Defendant arrived at that location approximately five minutes later, but the man again did not show. Defendant called Irma's phone, and the man answered yet

again and told defendant to meet him at a street located "before" Clark and Wilson Streets. Defendant did as he was told, but the man did not appear. Defendant proceeded to a bar, where he drank tequila and played pool. Defendant called Irma's phone and told the man the name of the bar at which he was drinking. When the man did not arrive at the bar, defendant left at approximately 3 a.m. and went to the apartment where his children lived.

Defendant testified that Irma called him the next morning, at approximately 8 or 9 a.m. They eventually agreed to meet later that day to talk about what had happened. Before leaving the apartment, defendant took a knife from the kitchen and hid it in his boot. Defendant stated that he brought the knife because the man who was with Irma on Saturday had threatened him; defendant testified he did not bring the knife with him in order to kill Irma. When defendant saw Irma, at approximately 6:15 or 6:20 p.m., she asked if defendant was upset and he stated "of course, yes." They arrived at the motel and defendant hid the knife in a drawer while Irma was in the bathroom. Defendant took a shower and then he and Irma had sex and talked. Irma's cell phone rang and she answered. Defendant could not hear to whom she was talking. When defendant asked whether the person on the phone was the other man, Irma just smiled but did not answer.

Defendant testified that after having intercourse two more times, he asked whether Irma was having a relationship with the other man and she replied that she did have sex with him. She explained that she started the relationship because she was jealous of the mother of defendant's children. Defendant then went into the bathroom to use cocaine. When he returned to the bed, he felt his body "paralyzed completely." Irma asked what was wrong, and defendant replied that

he was fine. After a few minutes, defendant returned to the bathroom to ingest more cocaine before returning to the bed. Before going to the bathroom, defendant had moved the knife from the drawer to under the pillow without notice from Irma. Defendant started shaking, and he got out of bed to go to the bathroom to use cocaine a third time. He felt his body had "lost control" and was "very hot." He pictured Irma having sex with another man.

Defendant testified that he returned to the bed and took the knife from under the pillow and he began to stab Irma. She told him to stop hurting her and that she would stay with him forever, but defendant stabbed her again. She fell off the bed and was bleeding from her neck. Defendant put his hands around her neck to put pressure on the injury. Defendant did not know whether he meant to choke her, but he did not release his hold on her neck until she became limp. He kneeled down next to Irma, crying, and said, "forgive me." Defendant then smoked a cigarette, showered, and called the police and Berta. Defendant told Berta that Irma was dead and "what happened had to happen." Berta began to cry and the call was cut off. Irma's cell phone then began to ring and when defendant answered, it was Berta. Berta asked if defendant was joking, and defendant replied "no."

Defendant testified that when he saw a police car approaching with the siren on, he opened the door, smoked a cigarette and went downstairs to meet the officers. He told them that he had killed his girlfriend, and the police laughed at him. After one of the officers checked the room and discovered Irma, the other officer told defendant, "Put your hands on your back" and handcuffed him. Defendant was placed in a police car and taken to the police station, where he gave a videotaped statement.

The trial judge found defendant guilty of first degree murder, merged count II into count I, and sentenced him to 27 years' imprisonment. Defendant filed this timely appeal.

First, defendant contends his trial counsel committed ineffective assistance by failing to file a motion to suppress defendant's statements where he was questioned shortly after ingesting a large amount of cocaine and where defendant spoke Spanish but was given his Miranda warnings and questioned in English. To succeed on an ineffective assistance of counsel claim, defendant must show that his counsel's performance was deficient and that defendant suffered substantial prejudice as a result of the deficient performance. People v. Bell, 373 Ill. App. 3d 811, 821 (2007). When the deficient performance involves a failure to file a motion to suppress, substantial prejudice exists if there is a reasonable probability that the motion would have been granted and that the outcome of the trial would have been different had the evidence been suppressed. People v. Orange, 168 Ill. 2d 138, 153 (1995). A failure to show substantial prejudice, in itself, disposes of the ineffective assistance claim. People v. Albanese, 104 Ill. 2d 504, 527 (1984).

Regarding defendant's argument that he was heavily under the influence of cocaine when the police questioned him, the evidence in support includes defendant's trial testimony that he had ingested $150 worth of cocaine, in three trips to the bathroom, before killing Irma. Defendant's videotaped statement refers only to a one-time use of cocaine, and there was no testimony from the officers that defendant showed any signs of impairment. In her ruling, the trial judge did not find defendant's trial testimony credible, stating:

"I can't imagine anybody being able to stand on their feet if they took $150 worth of cocaine. I mean, that whole, 'I took cocaine, and I was paralyzed and went and sat and

-8-

talked to her clearly and distinctly, and then I went and took cocaine again, and I went in the back and talked to her again. I went and took cocaine a third time, then I went and killed her,' it was just a crock, just such a crock. I am trying to say it nicely. It was such a lie. Just such an absurdity."

Given the trial judge's determination that defendant's testimony regarding his drug use lacked credibility, there is no reasonable probability that the trial judge here would have granted a motion to suppress statements based on defendant's cocaine use.

Defendant also argues that his trial counsel was ineffective for failing to file a motion to suppress because "the record shows that [defendant] spoke Spanish, yet the arresting officer admitted that [defendant] made inculpatory statements to police after he was Mirandized and questioned in English only." Defendant's contention is without merit. At trial, Officer Martinez testified that he and defendant spoke English to each other in all their conversations before defendant entered the police station. During their initial conversations, when the officers first arrived at the scene, Officer Martinez asked defendant whether he was the person who had called the police. Defendant replied affirmatively, explaining that he had done so because he had killed his girlfriend and that her body was in room 29. Officer Martinez arrested defendant, read him his Miranda rights, and placed him in the backseat of the police car. During their next conversations, again in English, defendant stated that he had killed Irma because he was jealous, that he had used a knife, and that he had flushed the knife down the toilet. During trial, the trial judge interrupted defendant's testimony, stating:

"I have to say [defendant] is answering the questions before they're interpreted, so

obviously he is understanding some English. And it is clear, because I have had him [in] court, that he can understand some English."

Thus, the record belies defendant's contention that he was unable to understand the <u>Miranda</u> warnings given to him in English. Defense counsel committed no ineffective assistance by failing to file a motion to suppress defendant's statements based on an alleged inability to understand English.

Further, the record indicates that after defendant was taken to the police station, he was given his <u>Miranda</u> rights in Spanish, after which he made a videotaped statement similar to the statement he had made earlier to the officers. Defendant's videotaped statement, coupled with his testimony at trial and the testimony of Irma's sister, would have resulted in defendant's conviction even if the earlier statements had been suppressed. Since the outcome of the trial would not have been different, defense counsel's failure to file a motion to suppress cannot constitute ineffective assistance.

Defendant argues that <u>People v. Lopez</u>, 229 Ill. 2d 322 (2008), compels a different result. In <u>Lopez</u>, our supreme court addressed the so-called "question first, warn later" technique sometimes utilized by police officers. <u>Lopez</u>, 229 Ill. 2d at 357. Under the question first, warn later technique, police officers question a defendant and elicit an incriminating statement without advising him of his <u>Miranda</u> rights. <u>Lopez</u>, 229 Ill. 2d at 357. After the statement is made, the officers then give defendant his <u>Miranda</u> rights, after which he is again interrogated until he repeats the incriminating statement. <u>Lopez</u>, 229 Ill. 2d at 357. Our supreme court held that where officers deliberately use the question first, warn later technique, statements taken after

Miranda warnings will be excluded unless "curative measures were taken, such as a substantial break in time and circumstances between the statements, such that the defendant would be able 'to distinguish the two contexts and appreciate that the interrogation has taken a new turn.' " Lopez, 229 Ill. 2d at 361, quoting Missouri v. Seibert, 542 U.S. 600, 622, 159 L. Ed. 2d 643, 661, 124 S. Ct. 2601, 2616 (2004) ( Kennedy, J., concurring).

Lopez is not applicable here because this is not a case where the officers deliberately used a question first, warn later technique. Rather, as discussed above, defendant indicated to the officers at the scene that he understood English and he was given his Miranda warnings in English prior to his arrival at the police station. The Miranda warnings were repeated in Spanish prior to the giving of the videotaped statement. The officers did not act in a calculated way to undermine the Miranda warnings and, thus, defendant's post-Miranda statements were not subject to suppression. Accordingly, defense counsel committed no ineffective assistance by failing to file a motion to suppress.

Defendant's final contention is that his 27-year sentence is excessive and the trial judge improperly sentenced him based on personal feelings about the crime. Defendant waived review by failing to file a postsentencing motion. See People v. Reed, 177 Ill. 2d 389, 390 (1997). Even on the merits, defendant's claim fails. Reviewing courts give great deference to sentences imposed by the that are within the statutory range for the crime at issue. People v. Kolzow, 301 Ill. App. 3d 1, 9 (1998). It is presumed that the trial court considers only competent evidence in sentencing. Kozlow, 301 Ill. App. 3d at 8. Furthermore, the trial court need not expressly state that it has considered mitigating factors because, absent evidence to the contrary, it is presumed

No. 1-07-0782

to have considered mitigating factors brought forth in argument. People v. Wright, 272 Ill. App. 3d 1033, 1046 (1995). The trial court is in the best position to weigh the factors relevant in sentencing, and a reviewing court will not overturn its determination absent an abuse of discretion. Wright, 272 Ill. App. 3d at 1045.

At the sentencing hearing, the trial judge first stated she had reviewed the presentence investigation report. The judge then heard arguments in aggravation and mitigation. In aggravation, the assistant State's Attorney read a victim impact statement from Irma's sister, Ms. Berta Cerritos, in which she stated that the murder had "shattered" the life of Irma's children and "completely devastated" Irma's mother. The assistant State's Attorney argued that the murder left Irma's children motherless, and he described how defendant had lured Irma to the motel room, armed himself with a knife, had sex with her multiple times, and then stabbed her and strangled her to death. The assistant State's Attorney argued that the murder took "a long period of time" and involved "much violence" and was so "brutal and vicious" that it necessitated a "significant amount of time in the department of corrections." In mitigation, defense counsel argued that Irma did not live with her children and that the father of her children had filed an emergency order of protection against her; that defendant did not "lure" Irma to the hotel but that she went of her own accord; that defendant had taken cocaine, which made him lose a sense of control; and that the reason he "went off" is because "he had imagined her having sex with another man." Defense counsel also argued defendant did not try to run or hide, but instead called the police and admitted to the crime. Finally, defense counsel noted that defendant had no prior felony convictions and that his four children would miss defendant if he was sent to jail for a long period of time.

The trial judge stated she had considered the factors in aggravation and mitigation. The trial judge then briefly summarized the testimony, noting that defendant had sex with Irma, then stabbed and choked her to death. The trial judge stated:

"It was absolutely premeditated. It was horrible, absolutely horrible what he did to this young woman, when he has another lady at home with four kids that he visits from time to time. I'm not expressing any kind of moral judgment on him or the victim. I don't care who anybody sleeps with. You don't have the right to kill somebody because they sleep with somebody else. That's all he did. He murdered someone because they decided to have sex with somebody other than him. And I'm sure the deceased figured if he had four children by a woman and can go there and spend the night with her, he was probably dipping there like he was with her. It's just disgusting. I have eight children who have no parents--with a mother missing from her four kids and a father missing because this man thinks he could kill somebody because they have sex with somebody else."

The trial judge stated that defendant did not deserve the minimum sentence, so she sentenced him to 27 years' imprisonment.

Defense counsel informed the trial judge that it had not offered defendant a right of allocution. The trial judge then asked defendant whether there was anything he wished to say before it "impose[d] sentence." Defendant stated that he asked forgiveness from Irma's family, admitted that he had committed an "error," and stated that he had discovered God. Defendant also stated that he had obtained "15 certificates and three diplomas."

The trial judge responded that she had not seen the 15 certificates and three diplomas, and

-13-

she told defense counsel that she would be willing to review those materials if they were presented to her. The trial judge stated:

> "I have to say that I've just heard the defendant's allocution and it certainly would not have changed the sentence that I imposed. He keeps calling first degree murder an error. A first degree murder is not an error."

The trial judge then recited for the record the various diplomas and certificates that defense counsel apparently had presented to her, including a diploma for the successful completion of a Bible course, and certificates from Bible academies indicating successful completion of study courses. The trial judge stated:

> "Like I said, what he said would not change the sentence that I imposed in this case. He does ask forgiveness [from] the family. He calls what he did an error. As I said not an error, it was to me, a murder that he planned to commit from everything that I heard in this case."

The judge stated that her sentence of 27 years' imprisonment would stand.

This record indicates that the trial judge properly considered all the evidence in aggravation and mitigation, that she corrected her earlier error and allowed defendant to make a statement in allocution, and then she sentenced defendant within the statutory range. Although the judge did express disgust at the fact that defendant killed Irma because he did not like her having sex with somebody else, "[t]he fact that a sentencing judge added some personal observations, while not to be encouraged, does not amount to an abuse of discretion" if the record shows he or she considered proper factors. Kolzow, 301 Ill. App. 3d at 9. There was no abuse

No. 1-07-0782

of discretion here.

Defendant contends that prior to trial, during a Rule 402 conference (177 Ill. 2d R. 402), the trial judge noted the State had offered defendant 20 years, and that "given these facts *** [she] certainly wouldn't have offered him 20." Defendant contends that these comments indicate the trial judge had prejudged the case and improperly relied on her own opinions (rather than the evidence in aggravation and mitigation) in sentencing him. Defendant's contention is without merit. As discussed above, a thorough review of the record indicates that the trial judge properly considered the evidence and arguments in aggravation and mitigation when sentencing defendant; we find no abuse of discretion.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

GALLAGHER and NEVILLE, JJ.'s concur.