2020 IL App (1st) 170543
No. 1-17-0543
Opinion filed December 31, 2020

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08 CR 4784 |
| IGNACIO CASTELLANO, | ) ) | The Honorable Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant Ignacio Castellano appeals from the first-stage dismissal of his *pro se* petition for postconviction relief.

¶ 2        Defendant was convicted after a bench trial of the first-degree murder of Rafael Villagrana and the aggravated batteries of both Jesus Sanchez and Javier

Cahue. For these offenses, defendant was sentenced on November 21, 2013, to a total of 32 years with the Illinois Department of Corrections (IDOC).

¶ 3　　On his direct appeal, defendant asked this court to reduce his first-degree murder conviction to second-degree murder, arguing that he had proved a mitigating factor by a preponderance of the evidence at trial. He argued that he had proved an actual, although unreasonable, belief in the need to act with deadly force to defend himself and another, namely, his brother-in-law. Finding this claim unpersuasive, we found that a "careful review of the trial record" showed that "a rational trier of fact" could have found that defendant failed in his burden to prove this mitigating factor. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 5.

¶ 4　　Presently, in his *pro se* postconviction petition, defendant argues: (1) that his trial counsel was ineffective for failing to request a fitness hearing and (2) that, due to an intellectual disability, he did not knowingly waive his right to a jury trial. Prior to trial, a psychologist had evaluated defendant and found that he had an IQ of 61, indicative of "mild mental retardation."

¶ 5　　For the following reasons, we affirm.

¶ 6                                          BACKGROUND

¶ 7                                        I. IQ Evaluation

¶ 8          Prior to trial, the trial court inquired, on August 3, 2010, if there was anything preventing the case from moving forward toward trial, "like mental health issues or something," and defense counsel responded that she was "look[ing] into that."

¶ 9          On January 13, 2011, a report was completed by a neuropsychologist at defense counsel's request, which was titled an "IQ Evaluation." The report stated that all interviews and testing were conducted in Spanish without the aid of an interpreter.

¶ 10         On the instant appeal, defendant claims that his trial counsel was ineffective for failing to request a fitness hearing, based largely on this report. Thus, we describe it below in detail.

¶ 11         According to the report, defendant was born to a poor family in Mexico, and never attended school. At age 12 or 13, he went to work in a factory. When defendant was between 12 and 14 years old, he fell from a height of three stories onto a pile of construction rubble, lost consciousness and suffered from amnesia after the accident. A friend encouraged him to come to Chicago, and he arrived here in the 1990s when he was 18 years old. Defendant is married and has three children.

¶ 12        On January 1, 2008, the Chicago Fire Department transported defendant to a hospital after he had lost consciousness due to a beating with blunt instruments. The report stated that defendant had been an alcoholic since age 19, and that he had begun using cocaine in 1999 or 2000.

¶ 13        The report concluded that defendant's "Intellectual Quotient" was 61 and that, "within [a] reasonable scientific and psychological certainty," defendant was "functioning intellectually at a level consistent with mild mental retardation." The report explained:

> "His strength is in working memory, which is a common finding among the mild mentally retarded. These individuals often rely on developing a good memory to 'pass' for normal by practicing and learning the behaviors they see in others, including verbal behaviors. [Defendant's] verbal comprehension was in the very low average to borderline range. Processing speed is very low."

¶ 14        In particular, the report observed that defendant "appears to have a very poor understanding of time. He could very vaguely tell his age when certain crucial events happened." For example, defendant told the psychologist "that he thought he was 29 years old but recently found out he [was] 31 years old."

¶ 15                                II. Jury Waiver

¶ 16       On September 30, 2013, both sides appeared for trial and a Spanish interpreter was sworn for defendant. Before the trial started, the trial court asked defendant if he wanted a bench or a jury trial, and defendant responded: "Bench."

¶ 17       An exchange then occurred concerning defendant's jury waiver. Since defendant claims that he failed to understand this waiver, *both* defendant and the State quoted almost the entire exchange in their appellate briefs to this court; and so we also provide it below:

> "THE COURT: Before I go back and ask you questions about that[,] let me go back a minute about the plea negotiations.
>
> Did your attorneys discuss with you the Prosecutor's offer of 35 years in the penitentiary?
>
> DEFENDANT: Yes.
>
> THE COURT: Have you had enough time to talk that over with your attorney?
>
> DEFENDANT: No.
>
> THE COURT: Do you want more time to talk that over with your attorney?
>
> DEFENDANT: No.

THE COURT:  I will ask that question again because I want to make sure you understand what we're talking about.

Your attorneys talked about the State's offer of 35 years in the penitentiary, correct?

DEFENDANT:  Yes.

THE COURT:  Do you think you have had enough time to talk with them about it or do you want to talk about it with your attorneys more?

DEFENDANT:  No, no.

MS. [KATHLEEN] MORIARTY[1]:  Judge, may I talk to him for a minute?

THE COURT:  Yes.  I think I know what's going on, but I want to make sure that we're clear.

(Whereupon, a discussion was held off the record.)

MS. MORIARTY:  I believe we are okay.

THE COURT:  Do you want more time to talk with your lawyer[s,] Ms. [Kathryn] Lisco and Ms. Moriarty about the State's Attorney's offer to plead guilty or do you wish to go to trial?

DEFENDANT:  I want to go to trial.

---

[1] We provide the names of defense counsel because there were two defense counsel present, and the transcript is easier to understand with both names provided.

THE COURT: Then we will go to trial. I am satisfied that [defendant] understands what I'm asking him and that he understands the offer that has been communicated by the State as is his right is rejecting that offer knowingly and intelligently and freely and voluntarily.

Do you share my opinion in that regard, Ms. Lisco and Ms. Moriarty?

MS. LISCO: Yes.

THE COURT: Do either of you wish more time to talk that issue over with [defendant]?

MS. LISCO: No, thank you, Judge.

THE COURT: We will go to trial.

There are two kinds of trial. A jury trial is a trial where your attorneys and the State's Attorneys, the prosecutor, under my supervision and in your presence would select 12 citizens from the community. Those citizens would sit in the jury box there. They would listen to the evidence, the arguments of the attorneys, and my instructions on the law that applies in this case. They would thereafter deliberate, and they would have to decide unanimously. They would all have to agree whether or not you were proved guilty beyond a reasonable doubt.

Do you understand that that's what a jury trial is?

DEFENDANT: Yes.

THE COURT: Do you have any questions about what a jury trial is?

DEFENDANT: I don't understand.

THE COURT: Do you wish to ask me any questions about what a jury trial is?

DEFENDANT: No.

THE COURT: Is this your signature on this document entitled jury waiver?

DEFENDANT: Yes.

THE COURT: I know it is written in English, but was it explained to you by your attorneys?

DEFENDANT: Yes.

THE COURT: Do you understand that by signing this document and giving it to me you're telling me that you wish to waive or give up your right to a jury trial? Do you understand that?

DEFENDANT: Yes.

THE COURT: If I accept your jury trial waiver we would then have what's called a bench trial. In a bench trial I, the judge, would listen to the evidence, the arguments of the attorneys. I would apply the law which I believe is applicable, and I and I alone would have to decide whether or not you were proved guilty beyond a reasonable doubt.

Do you understand that that's what a bench trial is?

DEFENDANT: Yes.

THE COURT: What do you wish to have, a jury trial or a bench trial?

DEFENDANT: Bench trial.

THE COURT: Has anyone promised you anything to get you to give up your right to a jury trial?

DEFENDANT: No.

THE COURT: Has anyone forced or threatened you in any way to get you to give up your right to a jury trial?

DEFENDANT: No.

THE COURT: Do you understand that even though I have talked to the attorneys about the case, even though you and I have seen each other in court, I have not heard any testimony? I do not know anything about the case. So I have no idea what decision I will make. Do you understand that?

DEFENDANT: Yes.

THE COURT: Understanding all of that do you wish to have a bench trial or a jury trial?

DEFENDANT: Bench trial.

THE COURT: And I will accept [defendant's] jury waiver, the Court believing that it's freely and voluntarily and knowingly and intelligently made.

* * *

MS. LISCO: Judge, in listening to your very thorough admonishments I believe when your Honor asked the defendant if he had gone over a written jury waiver with his attorney he did answer yes. Maybe if the record could be clear that the Spanish interpreter was present during that when he was signing in. I don't know if your Honor believes that that's necessary. I believe he was just since there is a Spanish—

THE COURT: Mr. Interpreter, will you do the Court a favor of interpreting the text in the written jury waiver to [defendant]?

DEFENDANT: Yes.

THE COURT: Do you understand what the jury waiver says?

DEFENDANT: Yes.

THE COURT: Was it read to you by our Spanish interpreter in Spanish?

DEFENDANT: Yes.

THE COURT: I will again indicate my acceptance of the written jury waiver, and we will proceed to a bench trial."

¶ 18                                III. Evidence at Trial

¶ 19        This court previously described the evidence at defendant's trial, in detail and at length, in our prior opinion concerning his direct appeal. *Castellano*, 2015 IL App (1st) 133874, ¶¶ 10-137. We incorporate that opinion here by reference.

¶ 20        On this appeal, defendant does not challenge the admission of any of the evidence at his trial or the sufficiency of the evidence against him. Thus, we summarize the evidence below.

¶ 21        At trial, the evidence established that a physical altercation occurred between, on one side, defendant and his brother-in-law Ramiro Landa, and, on the other side, three opponents: Rafael Villagrana, Javier Cahue, and Jesus Sanchez. Defendant was convicted of offenses relating to all three opponents. During the fight, defendant grabbed a knife out of his brother-in-law's waistband, thereby transforming what otherwise would have been a fist-fight into a fight where only one man was armed. *Castellano*, 2015 IL App (1st) 133874, ¶ 161. Two of the five men in the fight testified at trial: (1) Cahue and (2) defendant. Two of the five men died: (1) defendant's brother-in-law Ramiro Landa and (2) Rafael Villagrana.

¶ 22    Defendant testified that he and his brother-in-law went to a gangway outside a house where defendant had previously been beaten on New Year's Day; that defendant knew before the fight began that his brother-in-law was armed with a knife; and that, after the fight started, defendant grabbed the knife which had been hidden under his brother-in-law's jacket.  Defendant, who was testifying through a Spanish interpreter, testified that, during the fight, he heard someone say, "you cut me already brother-in-law." At one point, defendant swung the knife back and heard Cahue state that defendant had cut him. Defendant testified that Cahue begged "don't kill me, please don't kill me," and defendant replied that he did not want to kill anyone and that he was just defending himself. Defendant admitted that he did not observe any of the other men with a weapon and that he had stabbed one of the men in the chest. *Castellano*, 2015 IL App (1st) 133874, ¶¶ 59-60, 66-68.  Villagrana died from multiple stab wounds, including a stab wound to his chest; and defendant's brother-in-law Landa died from one stab wound to the left side of his lower neck.  *Castellano*, 2015 IL App (1st) 133874, ¶ 38.

¶ 23    Cahue testified that he, Villagrana and Sanchez were exiting his house into a gangway, with Villagrana in the lead, and Sanchez next, when they observed two men approaching.  Cahue identified one of the approaching men as Landa, and he identified defendant in court as the man with Landa.  An

altercation ensued, in which defendant stabbed Villagrana in the chest and stabbed Sanchez in the back. As defendant moved to slash Cahue, the knife accidentally caught Landa on the left side of Landa's neck. *Castellano*, 2015 IL App (1st) 133874, ¶¶ 13-14.

¶ 24 At trial, the defense emphasized the relative sizes of Cahue and defendant. Defendant was 5 feet 5 inches tall and only 130 pounds,[2] while Cahue was 280 pounds at the time of the offense.[3]

¶ 25 After listening to all the evidence and the arguments of counsel, the trial court found defendant guilty of the first-degree murder of Villagrana and the aggravated batteries of Cahue and Sanchez.

¶ 26 IV. Sentencing

¶ 27 Defendant's presentence investigative report indicated that he was 28 years old at the time of the offense; that he had one prior conviction for driving under the influence for which he had received 18 months of probation; that he had been employed at a meat-packing plant prior to his arrest; and that he had no gang affiliations.

---

[2] On cross-examination, a police detective testified that defendant's arrest report reflected that defendant was 5 feet 5 inches tall and only 130 pounds. *Castellano*, 2015 IL App (1st) 133874, ¶ 24. The neuropsychologist's report also noted that defendant is "of short stature and slight build."

[3] Cahue testified that he weighed 280 pounds at the time of the incident. *Castellano*, 2015 IL App (1st) 133874, ¶ 16.

¶ 28        Defense counsel submitted the neuropsychologist's report in mitigation. With respect to it, the trial court found:

> "Regarding the claim that he's intellectually disabled. I've reviewed Dr. Monguio's report and I certainly credit her detailed analysis, but it does have to be done in juxtaposition of the reasoned manner in which [defendant] testified, which was remarked upon I think in the defense closing argument He was cross-examined for some four or five hours during which time he did not evince any intellectual difficulties to my mind. He testified pursuant to the use of a [S]panish translator, a [S]panish interpreter. He had no difficulty in understanding what was asked on direct examination, cross examination, and answering appropriately thereto. However much I might have disagreed, or should I say found, some of his answers were not truthful."

¶ 29        After considering factors in mitigation and aggravation, the trial court sentenced defendant on November 21, 2013, to a total of 32 years. The sentence included 30 years for the murder and 2 years each for the aggravated batteries, with the 2-year sentences to run concurrently to each other but consecutively to the murder sentence.

¶ 30                        V. Postconviction Petition

¶ 31        As noted above, this court did not find defendant's claims on direct appeal persuasive, and defendant subsequently filed a *pro se* postconviction petition on December 16, 2016. The trial judge who considered defendant's petition was the same judge who had presided over defendant's trial and sentencing. In a detailed 16-page order filed on February 2, 2017, he summarily dismissed the petition as frivolous and patently without merit.

¶ 32        With respect to defendant's fitness to stand trial and understand the proceedings, the trial court found:

>        "Here, the record clearly disproves the notion that [defendant's] mental condition made him unable to understand the nature and purpose of the proceedings against him and assist in his defense. [Citation.] [Defendant] participated regularly at all stages of the proceedings and testified extensively at trial. [Defendant's] exchanges with the court do not display any confusion about the proceedings and he demonstrably assisted with his defense. [Defendant] has not attached any evidence which would contradict the record and establish that he was unfit to stand trial, or that a *bona fide* doubt as to his fitness existed. [Defendant's] reliance on the pre-sentence investigation's claim that his IQ is low is

unavailing, as mental retardation in itself does not render a defendant unfit."

The trial court concluded that defendant knowingly and voluntarily waived his right to a jury trial, and that there was "no evidence in the record to suggest a *bona fide* doubt of [defendant's] fitness."

¶ 33    On February 28, 2017, defendant, acting *pro se*, moved for an extension of time to file a notice of appeal.  On March 15, 2017, this court permitted defendant to file a late notice of appeal, and this appeal followed.

¶ 34                                  ANALYSIS

¶ 35                          I. Postconviction Stages

¶ 36     Defendant seeks relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), which provides for three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition only if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018); *Domagala*, 2013 IL 113688, ¶ 32.  In this appeal, the petition was dismissed at this first stage.

¶ 37    At the second stage, counsel is appointed if a defendant is indigent. 725 ILCS 5/122-4 (West 2018); *Domagala*, 2013 IL 113688, ¶ 33. After counsel determines whether to amend the petition, the State may file either a motion to

dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2018); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 38    If the defendant makes a "substantial showing" at the second stage, then the petition advances to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. At a third-stage evidentiary hearing, the trial court acts as factfinder, determines witness credibility and the weight to be given particular testimony and evidence, and resolves any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 39    When a matter is decided without an evidentiary hearing, as it was in this case, we review the trial court's decision under a *de novo* standard of review. *People v. Hommerson*, 2014 IL 115638, ¶ 6 (first-stage summary dismissal). Under a *de novo* standard of review, the reviewing court owes no deference to the trial court's judgment or reasoning. *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 68. *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Carlisle*, 2019 IL App (1st) 162259, ¶ 68. In addition, a reviewing court may affirm on any basis found in the record. *Carlisle*, 2019 IL App (1st) 162259, ¶ 69.

¶ 40                                    II. Ineffective Assistance Claim

¶ 41            Defendant's first claim is that his trial counsel was ineffective.

¶ 42            To determine whether a defendant was denied his or her right to effective assistance of counsel, Illinois courts apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36. Under *Strickland*, a defendant must prove both: (1) his or her attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness; and, (2) absent these errors, there is a reasonable probability that the outcome would have been different. *Domagala*, 2013 IL 113688, ¶ 36. "Under *Strickland*, reviewing courts entertain a strong presumption that the attorney's performance was a product of sound trial strategy and professional judgment." *People v. Harris*, 206 Ill. 2d 293, 303 (2002).

¶ 43            "At the first stage of proceedings under the Act, a petition alleging ineffective assistance of counsel may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010).

¶ 44            Defendant claims that his counsel was ineffective for failing to request a fitness hearing.

¶ 45     "To establish that the failure to request a fitness hearing prejudiced a defendant within the meaning of *Strickland*, a defendant must show that facts existed at the time of trial that would have raised a *bona fide* doubt of his ability 'to understand the nature and purpose of the proceedings against him or to assist in his defense.' " *Harris*, 206 Ill. 2d at 304 (quoting 725 ILCS 5/104-10 (West 1998)). " 'Defendant is entitled to relief *** only if he shows that the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing if it had been apprised of the evidence now offered.' " *Harris*, 206 Ill. 2d at 304 (quoting *People v. Easley*, 192 Ill. 2d 307, 319 (2000)). At the first stage, this means that, in order to establish arguable prejudice, defendant must point to facts that would have arguably raised a *bona fide* doubt of his fitness.

¶ 46     To determine whether a *bona fide* doubt exists, a court may consider: (1) a defendant's irrational behavior; (2) a defendant's demeanor at trial; and (3) any prior medical opinion on defendant's competence. *Harris*, 206 Ill. 2d at 304. However, there are no fixed or immutable signs which invariably indicate the need for further inquiry. *Harris*, 206 Ill. 2d at 305.

¶ 47     In support of his claim that his counsel was ineffective for failing to request a fitness evaluation, defendant relies primarily on the neuropsychologist's report which found that his IQ was 61 and that he was mildly retarded. In addition, defendant never attended school, either in the

United States or in his native Mexico; he testified that he had his birthdate tattooed on his hand so that he could remember it; and he alleged in his *pro se* petition that he was "unable to understand the nature and purpose of the proceedings against him." Defendant's petition further alleged that he "does not understand or speak any English." On appeal, defendant argues that his "no" and then "yes" answers in response to the judge's questions about the State's plea offer and his flat-out "I don't understand" in response to one of the judge's questions about a bench trial demonstrate his inability to grasp the proceedings, even with the aid of a Spanish interpreter.

¶ 48    The State argues that defendant forfeited this claim by failing to raise it on direct appeal. Defendant argues that he could not have raised this claim on direct appeal because his allegations of failing to understand the proceedings were not then a part of the record. *Harris*, 206 Ill. 2d at 303 (when a postconviction claim "relies on evidence outside the record on direct appeal," it is not forfeited by a failure to raise the claim on direct appeal). We observe that forfeiture is a limit on the parties not the court, and we exercise our discretion to consider the merits of his claim. *E.g.*, *People v. Wheeler*, 392 Ill. App. 3d 303, 309 (2009) (forfeiture is "a limit on the parties, not on the jurisdiction of the reviewing court").

¶ 49        Considering the claim on its merits, we do not find it persuasive.  Fitness to stand trial and be sentenced refers " 'only to a person's ability to function within the context of a trial' " and does not refer to " 'competence in other areas.' "  *Harris*, 206 Ill. 2d at 305 (quoting *People v. Easley*, 192 Ill. 2d 307, 320 (2000)).

¶ 50        In *Harris*, our supreme court considered, as we do now, a postconviction claim that trial counsel was ineffective for failing to request a fitness hearing.  *Harris*, 206 Ill. 2d at 302.  In *Harris*, the defendant provided psychological reports "which conclude[d] that defendant suffers from severe depression, dependent personality disorder, and organic brain disorder."  *Harris*, 206 Ill. 2d at 303.  Since the petition before it was at the second stage, the *Harris* court considered whether the defendant had made a substantial showing of ineffective assistance of counsel.  *Harris*, 206 Ill. 2d at 305.

¶ 51        Despite the extensive psychological assessments before it, the supreme court rejected the claim[4] because "the record clearly illustrates that defendant understood the nature and purpose of the proceedings."  *Harris*, 206 Ill. 2d at 305.  Our supreme court noted that the trial court provided "a detailed explanation of the proceedings and informed defendant of his rights," which he

_____

[4] Although three justices in *Harris* wrote separately on other issues, the supreme court was unanimous in rejecting this claim.  See *Harris*, 206 Ill. 2d at 328-30 (three separate partial concurrences and partial dissents by Justices Harrison, McMorrow and Kilbride).

stated he understood. *Harris*, 206 Ill. 2d at 305. "Furthermore, the record shows that defendant participated in his own defense, communicated and conferred with his trial counsel *** including the decisions to litigate rather than agree to a plea" and to waive his right to testify. *Harris*, 206 Ill. 2d at 305.

¶ 52     Similarly, in the case at bar, the record shows, first, that the trial court provided defendant with a detailed explanation of the proceedings and informed him of his rights. See *Harris*, 206 Ill. 2d at 305. In the lengthy exchange which we quoted above, the trial court explained, in detail, the differences between a jury trial and a bench trial. First, the court explained what a jury trial was and asked him if he had any questions about a jury trial. When he responded, "I don't understand," the judge followed up with: "Do you wish to ask me any questions about what a jury trial is?" Next, the court explained what a bench trial was and asked if he understood what a bench trial was. The trial court asked him at three different times in the proceedings, and in three different ways, whether he wanted a bench or jury trial, and he indicated that he wanted a bench trial each time.[5] After defendant responded affirmatively three times and signed the written waiver, the trial court asked the Spanish interpreter to translate it for him, on the record, which the interpreter did. Thus, the record shows that in our case, as in *Harris*, the trial court provided "a detailed

---

[5] Defendant specifically stated "bench trial" twice.

explanation of the proceedings and informed defendant of his rights," which defendant stated he understood. *Harris*, 206 Ill. 2d at 305.

¶ 53    "Furthermore, the record shows that defendant participated in his own defense." *Harris*, 206 Ill. 2d at 305. As the trial court observed at sentencing, defendant testified "in a reasoned manner." The trial court noted that defendant was "cross-examined for some four or five hours during which time he did not evince any intellectual disabilities." The trial court found that defendant appeared to have "no difficulty in understanding what was asked on direct examination, cross examination, and answering appropriately."

¶ 54    Defendant does not identify any particular portions of his trial testimony where he believes his disability impaired his testimony. We observe that, on cross-examination, when the prosecutor observed that defendant had confused the uniquely American holiday of Thanksgiving with New Year's Day, defendant explained that he "didn't really know about dates," but a "dinner is a dinner."

¶ 55    Defendant argues that his lack of understanding and the effect of his impairment is shown by the fact that he stated "I don't understand" during the exchange about the jury waiver. Defendant answered "yes" when asked if he understood what a jury trial was, but then replied "I don't understand" when asked if he had "any questions about what a jury trial" was. When asked if he

wanted to ask the court "any questions about what a jury trial" was, he said "[n]o." This exchange could be understood as defendant manifesting confusion about why he would have any questions when he had just answered that he understood.

¶ 56    However, whatever defendant's understanding was at that juncture in the proceeding, the exchange did not stop there. The court then asked: if it was defendant's signature on the written waiver; if his attorneys had explained the jury waiver to him; if he understood that he was giving up "your right" to a jury trial; if he understood what a bench trial was, after the court's explanation of a bench trial; if anyone had promised him anything or threatened him to give up his jury right; if he understood that the court had "no idea about what decision" it would make at a bench trial; and if, after all those additional questions and explanations, he still wanted a bench trial. Defendant responded "[b]ench trial," in response to two separate questions about whether he wanted a bench or a jury trial. Thus, we cannot find merit in defendant's argument that this exchange shows a lack of understanding by defendant of the right he was waiving.

¶ 57    Lastly, in our case, as in *Harris*, "the record shows that defendant communicated and conferred with his trial counsel *** including the decision[ ] to litigate rather than agree to a plea." *Harris*, 206 Ill. 2d at 305. In the

exchange quoted above, the trial court asked defendant if he had had enough time to discuss the State's 35-year plea offer with his attorneys. His counsel then asked for more time to discuss the offer with defendant, which the trial court readily granted. The transcript confirms that "a discussion was held off the record." Back on the record, the court asked defendant if he wanted another opportunity to discuss the State's offer, and defendant responded unequivocally: "I want to go to trial." Thus, the record shows that defendant communicated and conferred with his counsel about his "decision[ ] to litigate rather than agree to a plea." *Harris*, 206 Ill. 2d at 305.

¶ 58     Defendant argues that the facts in his case are analogous to the facts in *People v. Brown*, 236 Ill. 2d 175 (2010), which we observe was a 4 to 3 opinion. In *Brown*, the supreme court reversed the first-stage dismissal of a petition that alleged that counsel was ineffective for failing to request a fitness hearing. *Brown*, 236 Ill. 2d at 178. The instant case also involves a first-stage dismissal of a similar claim. However, the similarity ends there.

¶ 59     In *Brown*, the defendant waived his right to testify. *Brown*, 236 Ill. 2d at 189. As a result, his exchanges with the trial court prior to and during the trial were "brief exchanges" where he merely asserted that he understood the trial court's admonitions. *Brown*, 236 Ill. 2d at 190. The supreme court found that these brief exchanges failed to demonstrate "an ability to understand the

proceedings or assist in the defense." *Brown*, 236 Ill. 2d at 191. By contrast, in the case at bar, defendant not only testified in his own defense but was cross-examined for four or five hours, providing competent and responsive answers, as the trial court found.

¶ 60    In addition, the *Brown* court found that the nature of the offense itself "len[t] credibility to his allegations on his mental illness and history of suicide attempts." *Brown*, 236 Ill. 2d 186. In the *Brown* case, the defendant's partner called the police because the defendant was yelling and throwing things in their apartment. When police officers arrived, the defendant was standing outside of their apartment building, holding a knife. Although an officer repeatedly told the defendant to drop the knife, the defendant instead advanced toward the officer, swinging the knife. After the officer drew his handgun and again told the defendant to drop the knife, the defendant instead lunged toward the officer and toward a gun. The defendant was shot in the leg and lower back by another officer and fell to the ground. *Brown*, 236 Ill. 2d at 179-80. The *Brown* defendant's actions, particularly the act of lunging—unprovoked—*toward* a gun, could be viewed as indicative of mental illness.

¶ 61    By contrast, in the instant case, the facts of the offense itself are not indicative of mental illness or impairment. Rather, they are indicative of

someone bent on revenge for a prior beating.  Thus, we are not persuaded by defendant's argument that the facts of *Brown* are analogous to the instant case.

¶ 62    For the foregoing reasons, we cannot find that defendant has stated the gist of an ineffectiveness claim for his counsel's alleged failure to request a fitness hearing.

¶ 63                                III. Interpreter

¶ 64    Defendant did not raise his dealings with his interpreter as a separate claim.  However, we address this topic in its own section, to emphasize that this is an issue that we did not overlook.

¶ 65    Defendant argues in his appellate brief that "nothing in the record in any way establishes that [defendant] understood the interpreter or even that the interpreter correctly interpreted the court's comments to him."  Defendant argues that, at the start of the exchange, he stated that he did not understand and, at the end of it, counsel "appears concerned that [defendant] did not fully understand what the court explained to him" and, for that reason, requests that the interpreter read the jury waiver in Spanish to him again.  In his petition, defendant alleged that: the "English/Spanish interpreter was also ineffective to the [defendant] in helping [defendant] understand what was going on in the proceedings."

¶ 66        "Fundamental due process rights require a court to permit an interpreter to translate courtroom proceedings when a party does not fully understand English." *People v. Resendiz*, 2020 IL App (1st) 180821, ¶ 25. "When a defendant is not provided a complete translation of all proceedings, a defendant could be deprived of his or her right to a fair hearing." *Resendiz*, 2020 IL App (1st) 180821, ¶ 25.

¶ 67        In *Resendiz*, 2020 IL App (1st) 180821, ¶ 49, this court recently affirmed the summary, first-stage dismissal of a postconviction claim alleging that the defendant did not understand the Spanish interpreter when he waived his right to trial and pled guilty. This court observed that, "[w]hile defendant asserts that this court must accept his allegations as true unless contradicted by the record, defendant's allegations are not well-pled." *Resendiz*, 2020 IL App (1st) 180821, ¶ 44. "Significantly," the *Resendiz* petition "failed to provide any specific factual allegations as to what he did not understand" about his trial waiver. *Resendiz*, 2020 IL App (1st) 180821, ¶ 44. Instead, the *Resendiz* petition offered "only vague and conclusory allegations, which [were] insufficient to warrant further proceedings." *Resendiz*, 2020 IL App (1st) 180821, ¶ 25. Similarly, in the case at bar, defendant's petition offers only the vague and conclusory allegation that the interpreter should have "help[ed]" him more to better understand "the proceedings."

¶ 68    In *Resendiz*, 2020 IL App (1st) 180821, ¶ 45, we affirmed a first-stage dismissal, where "the transcript provided a full and complete record of the court proceedings which demonstrated defendant's knowing and active participation." We reach the same finding here.

¶ 69    First, contrary to appellate counsel's argument, it does not appear that defendant's trial counsel was concerned that defendant did not understand the waiver; rather, it appears that trial counsel wanted *the record* to be clear that the interpreter had definitely translated the written English document into Spanish for defendant. Second, the exchange does not indicate a lack of confidence in the interpreter by either defendant or his trial counsel. On the contrary, trial counsel *sought* the interpreter's translation of the waiver.

¶ 70    Third, the record does not disclose a reason to believe that the interpreter violated his or her statutory and ethical "obligat[ions] to accurately translate the proceedings in a courtroom." *Resendiz*, 2020 IL App (1st) 180821, ¶ 47. We have not been given any reason to doubt, that the interpreter was anyone other than a court-certified Spanish interpreter, who was "subject to both statutory requirements as well as a code of ethics." *Resendiz*, 2020 IL App (1st) 180821, ¶ 45. Section 1 of the Criminal Proceeding Interpreter Act provides:

    "Whenever any person accused of committing a felony or misdemeanor is to be tried in any court of this State, the court shall upon its own

motion or that of defense or prosecution determine whether the accused is capable of understanding the English language and is capable of expressing himself in the English language so as to be understood directly by counsel, court or jury." 725 ILCS 140/1 (West 2018).

Section 2 provides that "[t]he court shall enter an order of its appointment of the interpreter who shall be sworn to truly interpret or translate all questions propounded or answers given as directed by the court." 725 ILCS 140/2 (West 2018). See *Resendiz*, 2020 IL App (1st) 180821, ¶ 48 ("the interpreter is sworn to translate all proceedings accurately from English to Spanish and from Spanish to English").

¶ 71    In addition, the Illinois Supreme Court provides a Code of Interpreter Ethics for interpreters working in our courts. Canon 1 provides: "Interpreters shall render a complete and accurate interpretation or sight translation, without altering, omitting, or adding anything to the meaning of what is stated or written, and without explanation." Ill. S. Ct. Code of Interpreter Ethics Canon 1, at 4 (eff. Oct. 4, 2014).

¶ 72    In the case at bar, the record does not disclose a reason to believe that the interpreter violated these statutory and ethical obligations to translate accurately. See *Resendiz*, 2020 IL App (1st) 180821, ¶ 47.

¶ 73    Fourth, defendant testified for hours in his own defense at trial through an interpreter and provided responsive, competent answers. The record, as a whole, in this case "clearly demonstrates the active and understanding participation" of defendant. *Resendiz*, 2020 IL App (1st) 180821, ¶ 47.

¶ 74    Fifth, during the exchange quoted above, the trial court asked both of defendant's attorneys if they shared the court's opinion that defendant understood the offer communicated by the State and that defendant was rejecting that offer knowingly and voluntarily in favor of a trial; and his counsel agreed with the trial court's assessment of defendant's ability to understand and decide. Lastly, defendant did not assert in his petition that he did not understand the Spanish spoken by the interpreter; rather, he claimed it was the proceedings that confused him.

¶ 75    For all these reasons, we cannot find merit in defendant's appellate arguments regarding the interpreter.

¶ 76                              IV. Jury Waiver

¶ 77    Defendant's second claim is that his intellectual disability prevented him from knowingly and voluntarily waiving his right to a jury trial.

¶ 78    The State argues that this claim was not raised in defendant's *pro se* postconviction petition. In his petition, defendant alleged that counsel was ineffective for failing to request a jury trial. On appeal, his counsel argues that

this is further proof that defendant did not, and still does not, understand either that he was the one who waived this right or that it was his right to waive. As noted above, forfeiture is a limitation on the parties, not the courts, and, in the interests of judicial economy, we exercise our discretion to consider this fully-briefed claim on its merits.

¶ 79    As we already discussed in the prior section, the trial court thoroughly explained the differences between a bench trial and a jury trial, and asked him several different times, in several different ways, whether he wanted a bench or jury trial. Not only did he repeatedly choose a bench trial during this exchange, he also actively participated in that bench trial by testifying for hours in his own defense. Now, in hindsight, he wishes that his counsel had "requested" a jury trial instead. However, the record establishes that the difference was well explained to him, that he repeatedly answered "[b]ench," and that he participated actively and competently in that bench trial. Thus, we do not find this claim arguable.

¶ 80                                CONCLUSION

¶ 81    For the foregoing reasons, we do not find that defendant's *pro se* petition sets forth an arguable claim: (1) that his trial counsel was ineffective for failing to request a fitness hearing; or (2) that his intellectual disability prevented him

32

from knowingly and voluntarily waiving his right to a jury trial.

¶ 82        Affirmed.

---

**No. 1-17-0543**

---

| | |
|---|---|
| **Cite as:** | *People v. Castellano*, 2020 IL App (1st) 170543 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 08-CR-4784; the Hon. Timothy Joseph Joyce, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Manuela Hernandez, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon J. Waters, and David B. Greenspan, Assistant State's Attorneys, of counsel), for the People. |

---