# Illinois Official Reports

## Appellate Court

---

### *People v. Hayes*, 2021 IL App (1st) 172417

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE HAYES, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-2417 |
| Filed | October 29, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-2958; the Hon. Michele M. Pitman, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Ross K. Holberg, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon J. Walters, and Victoria L. Kennedy, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Justices Mikva and Oden Johnson concurred in the judgment and opinion. |

¶ 1     Following a jury trial, defendant Willie Hayes was convicted of first degree murder and concealment of a homicidal death and sentenced to consecutive prison terms of 36 and 4 years. We affirmed that judgment on direct appeal. *People v. Hayes*, 409 Ill. App. 3d 612 (2011). Defendant now appeals from the dismissal of his postconviction petition as supplemented. He contends that it raised meritorious claims that (1) direct appeal counsel was ineffective for not contending that trial counsel was ineffective for not arguing that defendant's video statement should be suppressed under *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion), and (2) trial counsel was ineffective for not seeking a fitness hearing where defendant was oversedated before trial and thus unfit to stand trial. For the reasons stated below, we affirm.

¶ 2                         I. JURISDICTION

¶ 3     Defendant filed a postconviction petition in 2012, appointed counsel supplemented the petition, and the circuit court granted the State's motion to dismiss the petition on September 22, 2017. Defendant filed his notice of appeal that same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651(a) (eff. July 1, 2017) governing appeals from a final judgment in a postconviction proceeding.

¶ 4                       II. BACKGROUND

¶ 5     Defendant was charged in relevant part with first degree murder and concealment of a homicidal death for, on or about January 4, 2004, fatally stabbing Nicole Boyd and placing her body in a plastic bag in a "dumpster" or trash bin.

¶ 6                    A. Motion to Suppress

¶ 7     In 2006, before trial, defendant filed an amended a motion to suppress evidence, alleging that he was arrested on January 10, 2004, and then interrogated without having been informed of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). He alleged that he could not understand his *Miranda* rights at the time "due to [his] physical, physiological, mental, educational, emotional and/or psychological state, capacity and condition," so that the resulting statements were not given voluntarily, knowingly, and intelligently as constitutionally required. He alleged that his statements were the result of physical and psychological coercion. Specifically, he alleged that he was handcuffed to a bench, then locked into a small interrogation room without being fed or allowed to use the restroom. While defendant was interrogated by three different detectives in turn, including being told that his account "was wrong," one detective defendant knew as "Mik" allegedly slapped his head and choked him.

¶ 8                    1. Detective El-Amin

¶ 9     At the 2006 motion hearing, Detective Mikal El-Amin testified that he investigated the Boyd homicide in January 2004 and defendant was arrested on January 8. Lieutenant Jeffrey Bohlen told El-Amin that he had briefly interviewed defendant, with defendant denying involvement in Boyd's death, and Bohlen opined that he did not believe defendant was involved. El-Amin interviewed defendant at about 6:30 p.m. on January 8. With Detective

Louis Alessandrini also in the interview room, El-Amin first read defendant his *Miranda* rights from a form, then asked defendant to sign the form to indicate his understanding of those rights. Defendant indicated he understood his rights and signed the form. The form, signed by defendant, El-Amin, and Alessandrini and marked 6:35 p.m. on January 8, 2004, was produced at the hearing.

¶ 10   In the interview that followed, defendant at first denied any involvement in Boyd's death, maintaining that he and Boyd argued, then he left, and then he returned to find her gone. However, after further questioning, defendant then said that Boyd produced a knife during their argument, he and Boyd struggled for the knife, and when they fell onto the couch the knife accidentally went into her neck. Defendant's change of story was not induced by the detectives confronting him with evidence, as "we didn't have much evidence then. We just told him that the story didn't sound right." In other words, the detectives believed his first account was a lie and told him so. El-Amin then clarified that defendant changed his story to accidentally causing Boyd's death when confronted with the information that a neighbor saw Boyd with a bloody mouth and heard her remark that "she was about to kick the defendant out of the house." Defendant told El-Amin that he "put her in the car and dumped her off in the alley" and offered to take detectives to Boyd's body. When El-Amin and Alessandrini brought defendant to the location he specified, about two blocks from Boyd's apartment, they and Bohlen looked for Boyd's body but found nothing.

¶ 11   El-Amin and Alessandrini then took defendant back to Boyd's apartment, where he gave another location for her body. At about 8 p.m., Boyd's body was found there, in a trash bin behind her apartment building. El-Amin took defendant back to the police station while Alessandrini stayed with the body. Once there, El-Amin alone questioned defendant. He first reminded defendant "that he was still under his rights," and defendant indicated that he understood. He "basically" told the same story but admitted that "instead of the knife accidentally going into her neck, he kind of forced it into her neck" only once. Defendant also told El-Amin that he put the knife in the same bag as Boyd's body. The interview ended, and defendant was placed in a cell.

¶ 12   The next day, El-Amin alone interviewed defendant upon arriving at the police station at about 9 a.m. He first read defendant his *Miranda* rights from a form; defendant said he understood his rights and signed the form to show that he understood. The form, signed by defendant and El-Amin and marked 9:10 a.m. on January 9, 2004, was produced at the hearing. In the brief interview, El-Amin asked defendant if there was anything else he would like to say, but defendant said "no," so that his account was unchanged from the one he gave the previous evening.

¶ 13   El-Amin spoke later that morning with Assistant State's Attorney (ASA) Nick D'Angelo, who came to the police station and interviewed defendant in the early afternoon with no detectives present. D'Angelo then told El-Amin that the knife was on the roof of Boyd's apartment building. El-Amin and D'Angelo went there, and the knife was found and inventoried. They returned to the station, and D'Angelo again interviewed defendant. El-Amin had no contact with defendant from the brief interview at about 9 a.m. until the next day when defendant gave his videotaped statement.

¶ 14   On the morning of January 10, El-Amin attended Boyd's autopsy while D'Angelo again interviewed defendant. After El-Amin came to the police station, he and D'Angelo were present for defendant's videotaped statement in the mid-afternoon. Defendant had been quiet

and somber but responsive to questions throughout his interviews. To El-Amin's knowledge, defendant was never denied food or use of a washroom while in custody. He denied choking or striking defendant.

¶ 15  On cross-examination, El-Amin testified that he did not know when defendant was brought to the police station before El-Amin interviewed him at about 6:30 p.m. A police report refreshed his recollection that defendant was arrested at about 12:30 p.m. He saw Bohlen enter and exit the interview room so he knew his interview of defendant was brief, less than 10 minutes, and Bohlen went off-duty about 10 minutes later at 5 p.m. He did not know if Bohlen read defendant his rights, and he presumed that nobody interviewed defendant before Bohlen. El-Amin read the police reports and discussed the case with other officers before the interview.

¶ 16  When El-Amin first entered the interview room, he and defendant were alone for about three minutes before Alessandrini entered and El-Amin read defendant his rights. Defendant changed his story to having stabbed Boyd accidentally in a struggle fairly quickly, about 15 to 20 minutes into the interview. El-Amin left the interview "maybe twice," during which Alessandrini was alone with defendant. At least one time was after defendant had admitted an accidental stabbing. It was over an hour into the interview that defendant said he dumped Boyd's body in the alley. El-Amin denied ever raising his voice to defendant and denied that he was handcuffed in the interview room. El-Amin did not see defendant eat nor did he or Alessandrini offer defendant food, but he knew "that when you're in the lockup facility that you are fed."

¶ 17  Defendant was at the alley location for about 10 minutes, and then at Boyd's building for about 20 minutes. Bohlen stayed with defendant in the police car, El-Amin did not know if defendant make any statements while El-Amin was not in the car, and he did not recall Bohlen reporting or telling him of any such statements. While El-Amin testified that Boyd's body was found at about 8 p.m., Bohlen's police report indicated a time around midnight. El-Amin could not recall when, in the interview after returning to the station upon finding the body, defendant admitted that he forced the knife into Boyd's neck. When pressed, he guessed "[m]aybe 15 minutes." El-Amin made no written report of the interview on the morning of January 9 because defendant added nothing to his last account of January 8.

¶ 18  On redirect, El-Amin testified that he was not sure how many times he left the first interview but guessed that it was twice. Defendant did not complain that he was not fed. Defendant was arrested during a January 8 wellbeing check at Boyd's apartment but upon an unrelated arrest warrant. While Bohlen opined that defendant was not involved in Boyd's death, other police officers were still at Boyd's apartment because there was apparent blood on pillows and walls there, which defendant had claimed to be spaghetti sauce. Bohlen had left work before El-Amin's first interview but came back to work when defendant told El-Amin that he knew the location of Boyd's body. Bohlen's report on finding the body indicated that the body was found about 7:48 p.m., but the report was prepared at midnight.

¶ 19  On recross examination, El-Amin testified that he was at first investigating the Boyd case as a missing person case, as no body had been found, though police suspicion had been raised by the apparent blood on the couch and elsewhere in Boyd's apartment. There were police in the apartment from defendant's arrest onwards. El-Amin admitted that he first believed upon re-reading Bohlen's report that the body was found around midnight.

## 2. Detective Alessandrini

¶ 21    Alessandrini testified that, on January 8, 2004, he was investigating Boyd as a missing person with a possible suspect—defendant—found in her home and arrested on unrelated warrants. He and El-Amin interviewed defendant in an interview room after El-Amin Mirandized defendant, who acknowledged understanding his rights verbally and by signing the *Miranda* rights form. El-Amin and Alessandrini also signed the form and marked it at 6:35 p.m. on January 8, and Alessandrini recognized the form in the hearing. After being Mirandized, defendant said he had been living with Boyd and they had an argument but denied knowing where she was for the preceding couple of days. Defendant was confronted with information that a neighbor had seen her just before the last time defendant admitted seeing her, when her mouth was bleeding and she was saying that she would "put the defendant out of her house."

¶ 22    Defendant then gave a different account. They argued until she slapped him, and he slapped her back. He went to get her water but returned to find she had armed herself with a knife. They struggled over the knife, fell backwards, and the knife went into her neck. He said that he put her body in the bathtub and filled it with cold water before leaving the apartment. On returning, he found that she was dead so he removed her clothing, put her in a garbage bag, and dumped her body in a trash bin a few blocks away. El-Amin and Alessandrini asked defendant to show them where he dumped the body, and he agreed. Defendant led them to a location "a couple of blocks" from Boyd's home and indicated particular trash bins, but the detectives' search was fruitless. They went to Boyd's apartment, where her body was found in a trash bin behind her building. Alessandrini stayed with the body while El-Amin took defendant back to the police station, and he never spoke with defendant again.

¶ 23    During the interview, defendant was not refused food, water, or restroom use, nor did defendant ask for food or water. He was cooperative, though not truthful. Neither Alessandrini nor El-Amin punched, slapped, or choked him. Alessandrini could not recall if he left the interview but recalled being alone with defendant at some point, though he could not recall when or for how long. Defendant did not complain of any ill-treatment while alone with Alessandrini.

¶ 24    On cross-examination, Alessandrini testified that he and El-Amin were assigned the Boyd case at about 4 p.m. by Bohlen. Before he and El-Amin interviewed defendant, Bohlen told Alessandrini that he had interviewed defendant, and Alessandrini and El-Amin read the reports and discussed the case with other officers. El-Amin prepared the *Miranda* form for the interview, and he and Alessandrini entered the interview room together at about 6:30 p.m. El-Amin Mirandized defendant after the detectives introduced themselves and determined that defendant could read and write English. Defendant gave his first account of events essentially immediately after being Mirandized, and he changed that account within the first half-hour of the interview. The version where he admitted accidentally stabbing Boyd was actually his third account, preceded by a story that another man stabbed her and defendant merely helped him dispose of the body. Only El-Amin prepared a report of the interview, and no photograph was taken of defendant after the interview. Alessandrini could not recall if defendant was brought any food, though "[i]f he was in lockup, they feed them three times a day."

¶ 25    The entire interview, from beginning until the detectives left to find Boyd's body, was about an hour, and it took about five minutes to reach the first scene. The body was found elsewhere and defendant was returned to the police station about another 25 minutes later.

Bohlen came to the later scene and was there when the body was found. Though Alessandrini did not attend, he knew El-Amin and an ASA had subsequently interviewed defendant. He could not recall if he discussed with El-Amin his interview of defendant on January 9, though they discussed the general progress of the case. At one point, he saw defendant being interviewed, but he could not recall the time or seeing who the interviewer was.

¶ 26                                  3. ASA D'Angelo

¶ 27    D'Angelo testified that he was assigned on the evening of January 8, 2004, to the Boyd homicide case and went to the police station, where he spoke with detectives and was brought to the crime scene. He did not meet defendant that day. He returned to the station at about noon on January 9, and El-Amin described his interviews of defendant the previous evening and that morning. The key points in that information were that defendant said he stabbed Boyd only once and that he left the knife in the bag with her body, but in fact no knife was found in the bag.

¶ 28    D'Angelo interviewed defendant at about 12:30 p.m. in an interview room. He was alone with defendant and, after introducing himself as a prosecutor, recited defendant's *Miranda* rights from memory. Defendant agreed to be interviewed and gave an account consistent with his last account to El-Amin. D'Angelo confronted defendant with his lie concerning the knife and told him that he should tell the truth if he wanted to be believed. During the interview, D'Angelo had asked defendant if he was mistreated by the police, and he denied any mistreatment. Defendant said he would give the knife's true location. After he stabbed Boyd but before cleaning up and hiding the body, he ran outside to the back of the apartment building and threw the knife onto the roof.

¶ 29    The interview ended, and D'Angelo, another ASA, and police went to Boyd's home where the knife was found on the roof near the rear of the building.

¶ 30    D'Angelo returned to the police station and confronted defendant with the discovery of the knife before asking him to give his account of events. Defendant then recited the same account as before except for the location of the knife, including that he stabbed Boyd only once. D'Angelo did not Mirandize defendant during this interview. The interview ended about 3:30 p.m., and D'Angelo did not see defendant for the rest of the day.

¶ 31    On the morning of January 10, D'Angelo attended Boyd's autopsy, where he learned that she had been stabbed more than once. He then went back to the police station to interview defendant shortly after noon. Defendant was brought up from the cells to the interview room.

¶ 32    After asking defendant if he had been treated well and learning that he had, D'Angelo had defendant give his account again. Defendant and Boyd were arguing in the kitchen when she slapped him and he then slapped her. She then grabbed a knife and came at defendant to stab him. He grabbed her arm, they struggled for the knife and ended up in the living room, and they fell over the couch. As he fell on top of her, he pushed the knife into her neck. This was essentially the same story as his last account, so D'Angelo confronted defendant with the autopsy results that Boyd was stabbed more than once. When D'Angelo told defendant that he was lying again, he gave yet another account. He then agreed to have his statement videotaped, signing a consent form to that effect, which was presented in the hearing. El-Amin came into the interview room to witness and cosign the consent form, and D'Angelo sent for a videographer.

¶ 33        Defendant, D'Angelo, El-Amin, and the videographer were present for the resulting videotaped statement at about 3:20 p.m. on January 10. Defendant was again Mirandized "during this interview" and expressed that he understood his rights. Defendant then reiterated his last account. During the videotaped interview, defendant made no complaints about his treatment and said he had not been threatened or made any promises.

¶ 34        On cross-examination, D'Angelo testified that, when he Mirandized defendant in their first interview on January 9, he did not have defendant sign a *Miranda* rights form or waiver. When he left with officers to find the knife, defendant was still in the interview room, and he did not know whether defendant was left in the interview room or returned to a cell. He could not recall if defendant was in the interview room when they returned at about 1:45 p.m. from finding the knife. He did not recall seeing defendant eat or drink. D'Angelo interviewed defendant alone until the videotaped interview, and nobody but him spoke with defendant on January 10 or on the previous day once he arrived at the police station. While he left the station and could not see defendant at every moment while there, he was never far from the interview room while there.

¶ 35                                        4. Mid-Hearing Motion
¶ 36        The State made a motion that the court find that the State met its burden at that point in the hearing. Following arguments, the court found that the State made a *prima facie* case, and the burden shifted to the defense to show coercion and lack of Mirandization.

> "I've heard the defendant was given his *Miranda* rights. The motion alleges the defendant was never given his *Miranda* rights. I've heard all witnesses gave the defendant his *Miranda* rights, as well as on the video tape the defendant is given his *Miranda* rights, acknowledges that he understands his *Miranda* rights while being video taped."

¶ 37                                        5. Defendant
¶ 38        Defendant testified that he was 25 years' old and completed one year of high school. He attended various elementary schools, not because he needed remedial education but because his family moved often. During that period, he became a ward of the Department of Children and Family Service and was placed with his grandmother. He did not receive psychological treatment or therapy during his wardship.

¶ 39        On January 8, 2004, defendant was arrested and brought from his home to the police station, where he was handcuffed to a bench for a half-hour to an hour. He was then taken upstairs to be interviewed by a detective, in a room with a desk and some chairs. That interview took about 10 minutes, and the detective did not read defendant his rights. Afterwards, he was placed in the room next to where the interview occurred, where he was alone for about a half-hour until "Detective Mik" and another detective came into the room and Mik questioned him. Mik then left the room, and the other detective questioned him, telling him that Mik did not believe him. Mik returned to the room, spoke with the other detective outside the room, and came back into the room. Mik told defendant to give his account of events again, telling him in an "aggressive" manner that he did not believe defendant. Defendant did not recall anyone Mirandizing him to that point. When defendant gave his account again, Mik grabbed him by the coat and told him to change his story as it "wouldn't hold up in court." Defendant began crying, and Mik slapped him on the head. Defendant flinched, and Mik choked him and struck

him again. Mik kept hitting defendant and demanding he change his story for a half-hour, until defendant agreed to change his story so Mik would stop hitting him and because Mik said his story would not hold up in court. Mik "asked me to go over the story with him again and to instead of saying that I fell over Miss Boyd with the knife, to say that I picked up the knife and that I stabbed her." They reviewed this account several times, then Mik took defendant to the holding cells.

¶ 40    Defendant was brought back upstairs from the cells the next day and placed in the same interview room as the previous day. He was there for about a half-hour before Mik came in and told him that an ASA would be interviewing him, then reviewed the story with him and told him not to change it. Mik also gave defendant a document to sign, which he said concerned his arrest warrant. Most of the document, other than the bottom where he signed, was covered by another piece of paper. About an hour later, an ASA came into the room. He did not read defendant his rights, and he told defendant to stick to the story he rehearsed with Mik. Defendant then recounted that story. Twice, he tried to give his own account but the ASA would not listen to it. While the ASA told him that he had to sign a form for his videotaped statement, he never gave him a *Miranda* rights form. When he told the ASA that Mik had choked and slapped him, the ASA left the room and returned with the form for the videotaped statement.

¶ 41    On cross-examination, defendant testified that, as Mik was interviewing him, Mik was clenching his fists before he grabbed defendant by the coat. Defendant's account, which Mik dissuaded him from giving, was that Boyd and he were arguing when she struck him and he then struck her, when he went to get water for her bleeding she came at him with a knife in hand, and in the resulting struggle for the knife, they fell backwards over the couch and the knife ended up in Boyd's neck. Defendant denied that his initial account was an outright denial and maintained that he gave the preceding account from the outset of his interviews. When the ASA came in for the first time with Mik, defendant told the ASA that he did not want Mik in the room, and Mik left. Defendant admitted that he told the ASA that he had been treated "fair." Defendant at first did not want to give a videotaped statement, but the ASA told him that it could benefit him by reducing his sentence. He could not recall if he was Mirandized during the videotaped statement, and he had not reviewed the video before his hearing testimony. He recalled saying in the statement that he stabbed Boyd only once, until he was confronted with the statement to the effect that he stabbed her multiple times.

¶ 42    On redirect examination, defendant explained that he told the ASA his treatment was "fair" because he realized the ASA "and the detective were working together with this story" and wanted to avoid more physical abuse. Mik was present throughout the taking of the videotaped statement.

¶ 43                    6. Ruling

¶ 44    Following arguments, the court denied the motion to suppress. It noted the testimony of both detectives and the ASA that each had given defendant *Miranda* warnings and defendant gave his inculpatory statements because he had been generally quiet and cooperative and was confronted with discrepancies in his account and defendant's testimony that the first of the detectives to interview him gave him a story to tell. Noting that it had to make credibility determinations, the court found that the State's witnesses were borne out by defendant's demeanor in court. It found that nothing had been presented in the hearing to show that

defendant's statement was not voluntarily given and expressly found that "defendant was given his *Miranda* warnings and that he voluntarily waived his *Miranda* warnings."

¶ 45                                  B. Other Pretrial Proceedings

¶ 46    A November 2006 pretrial investigative report indicated in relevant part that defendant, who was 25 years old at that time, having been born in August 1981, was treated for anxiety with Prozac since he was 15 years old, was in the residential treatment unit during his first year in jail, and was treated in jail for depression and insomnia "[l]ately" with a prescription of Effexor.

¶ 47    During an August 2007 hearing, the court asked defendant what was "the matter with you." Defendant replied that he was sick with a stomachache but would be able to proceed.

¶ 48    Defendant testified again, responding coherently to questions, in the October 2007 hearing on his unsuccessful motion to quash arrest.

¶ 49                                  C. Trial and Posttrial

¶ 50    At the 2009 trial, Boyd's mother testified to reporting to the police on January 8, 2004, that Boyd was missing. Police officers Michael Leuser and Stuart Murtagh went to Boyd's apartment that day. Defendant answered the door and admitted them to the home when they said they were there to discuss Boyd. Defendant sat with them in the living room and told them that he and Boyd had argued, she left, and he had not seen her since January 4. However, a rope and a large red stain resembling a bloodstain were on the couch. A search of the apartment with defendant's permission found red-stained clothing and tissue in the bathroom, a red stain on the shower curtain, stains along the bathroom walls and the bathtub, and hair and red skin-like tissue near the bathtub drain. Defendant was arrested and taken to the police station. The blood on the couch in Boyd's apartment was later found to be hers.

¶ 51    Alessandrini, El-Amin, and D'Angelo testified consistently with their hearing testimony, with D'Angelo adding that he Mirandized defendant before his first interview on January 10 after the autopsy.[1] In the alley behind Boyd's apartment building, they found not only Boyd's body in the trash bin but bloody items in nearby trash cans: a blanket, pillow, and articles of clothing. The knife found on the roof of Boyd's building, as defendant told D'Angelo, was later found to bear defendant's fingerprints.

¶ 52    The jury viewed defendant's videotaped statement. Defendant's earlier statements were elicited from him before ASA D'Angelo read him his *Miranda* rights and he gave his statement.

¶ 53    Boyd's autopsy showed that she had several stab and incision wounds, including incision wounds on the right side of her forehead and face, a stab wound on the left side of her face, and a stab wound to the right side of her neck. She had bruised lips and signs of compressional trauma to her neck. She had incision wounds and an abrasion to her right forearm and hand consistent with fending off a knife attack.

---

[1]This testimony was not inconsistent with the hearing testimony, as neither the State nor defense asked D'Angelo in the hearing if he had Mirandized defendant during the first interview of January 10.

¶ 54 The court advised defendant of his right to testify, and defendant replied to the court's inquiries that he had discussed the prospect of testifying with trial counsel and chosen to not testify.

¶ 55 Following arguments, jury instructions including second degree murder, and deliberations, the jury found defendant guilty of first degree murder and concealment of a homicidal death. In his unsuccessful posttrial motion, defendant did not challenge the denial of his motion to suppress.

¶ 56 While the record does not contain the presentencing investigation report (PSI), the court stated on the record that it reviewed the PSI. Defendant's mother and two siblings testified in the sentencing hearing, describing the abuse in his childhood home. Defendant addressed the court at length, taking "full responsibility" for, and expressing deep remorse for, Boyd's death and asking the court to "not see me as some menace to society." Following evidence and arguments in aggravation and mitigation, the court sentenced him to consecutive prison terms of 36 and 4 years.

¶ 57                                D. Direct Appeal

¶ 58 On direct appeal, defendant contended that (1) the trial court erred by not giving jury instructions on involuntary manslaughter, (2) he was denied a fair trial by certain remarks the State made in rebuttal closing argument, (3) the court committed plain error by making incomplete Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) inquiries during jury selection, (4) his sentence was excessive, and (5) he was entitled to credit for another seven days of credit for time served. *Hayes*, 409 Ill. App. 3d at 613. We affirmed the convictions and sentences except for granting six additional days of sentencing credit. *Id.* at 630-31. In affirming, we found that the trial evidence was not closely balanced. *Id.* at 625, 628.

¶ 59                          E. Postconviction Proceedings

¶ 60 Defendant filed his *pro se* postconviction petition in mid-2012. He claimed in relevant part that trial counsel was ineffective for not seeking to suppress his statement and direct appeal counsel was ineffective for not raising said ineffectiveness. In particular, he alleged that he was not read his *Miranda* rights until midway through his videotaped interview, after he had made incriminating statements, so that the entire interview should be suppressed. The petition acknowledged that trial counsel had filed a *Miranda*-based motion to suppress and that there was testimony in the motion hearing that defendant had been Mirandized multiple times before the videotaped interview. Defendant argued that trial counsel was nonetheless ineffective for not arguing particularly that defendant was not Mirandized during the videotaped interview until after he had incriminated himself. Defendant argued that because the videotaped statement was obtained without proper *Miranda* warnings or waiver, the discovery of Boyd's body and the knife should be suppressed, as well as the videotaped statement itself.

¶ 61 In his petition and his motion for appointment of counsel, defendant alleged in part that he was currently being prescribed mind-altering psychotropic medications, which "prevents any concentration abilities for more than a few minutes at a time," so that he should have the assistance of counsel to amend or supplement his *pro se* petition.

¶ 62 The court appointed counsel on defendant's petition in August 2012.

¶ 63    In July 2016, the circuit court ordered its Forensic Clinical Services (FCS) to provide any records and written material it had regarding any psychological evaluation of defendant between 2004 and 2010. FCS reported in August 2016 that it had no records regarding defendant.

¶ 64    In December 2016, counsel filed a supplemental petition and a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) that counsel consulted defendant by telephone and mail, reviewed the record, and filed the supplemental petition to present additional claims arising from reviewing the record. In relevant part, the supplemental petition claimed that trial counsel was ineffective for failing to seek a fitness hearing when defendant was "very depressed and suicidal" while in jail from 2004 through 2009, taking psychotropic medication (Depakote, Effexor, trazodone, Risperdal, Zoloft, Thorazine, doxepin, and Seroquel) and requiring hospitalization and restraint. The trial court was unaware that defendant had been suicidal, was taking psychotropic medications, and had been restrained, and counsel claimed that it would have ordered a fitness hearing had it been aware.

¶ 65    In support of the supplemental petition, counsel attached defendant's (1) affidavit that, in relevant part, "I was taking medication which affected my ability to think clearly" while in jail and during the trial and (2) medical records from the jail hospital for the time from 2004 into 2009 that he spent in mental health treatment. The records showed that defendant was diagnosed with insomnia, depression, and bipolar disorder and was taking various psychotropic medications at various times including Depakote, Effexor, trazodone, Zoloft, Thorazine, doxepin, Risperdal, and Seroquel. At the same time, he had no apparent delusions or perceptual disturbances, his impulse control was fair or good, and his memory was intact. Defendant was evaluated in the jail hospital in March 2004 for agitation and aggressive behavior and was admitted to the "dorm" or ward there. He expressed suicidal intent and had been placed in the psychiatric ward and restrained to protect himself and others, but he was returned to the general jail population in December 2005. He was admitted to the emergency room of the jail hospital in 2005 for oversedation attributed to the side effects of medication and was readmitted for the same in December 2008. According to a 2007 report, he had made a "suicide gesture" of overdosing on aspirin 9 to 10 years before.

¶ 66    The State filed a motion to dismiss in March 2017. Regarding the video interview, the State argued that trial counsel filed and the parties fully litigated a pretrial motion to suppress, in which multiple witnesses testified that defendant was Mirandized multiple times before the video statement. The State also argued that the *Miranda* warnings during the video interview were preceded by recitations of what defendant had already said in previous interviews so that he was questioned anew only after he was Mirandized anew.

¶ 67    Regarding trial counsel not moving for a fitness hearing because defendant was on psychotropic medication while in jail, the State noted that defendant was in jail from his January 2004 arrest to his February 2009 trial and May 2009 sentencing and that two judges presided over his case in that time. "Not one time during the five years this case was pending did a single judge, state's attorney or defense attorney have a *bona fide* doubt of [defendant's] fitness," nor did defendant "state anything to the judge that he was on medication, had mental problems or any history of mental issues. [He] was in court on each and every court date and stayed silent." The jail records and defendant's PSI reflected depression, anxiety, and insomnia, and the State argued that "[t]hose are not mental issues that rise to the level of fitness for trial or sentencing." The State pointed to caselaw holding that being on psychotropic

- 11 -

medication does not by itself constitute *bona fide* doubt of fitness, which is determined under the totality of the circumstances.

¶ 68 At the hearing on the State's motion to dismiss, the State argued that defendant's *Miranda* challenge had been litigated in the pretrial motion to suppress statements. Regarding the claim that trial counsel was ineffective for not requesting a fitness hearing, the State argued that the claim should be dismissed because, in the five years between his arrest and trial, defendant appeared before two judges who never raised a concern about his fitness nor did he ever state that he was on medication or mention any mental health issues. While defendant's PSI reflected depression, anxiety, and insomnia, neither these conditions nor his medication showed that he had been unfit.

¶ 69 Postconviction counsel argued that defendant's *pro se* arguments were not barred because they alleged ineffective assistance of counsel. On the fitness issue, she acknowledged that "the law as I read it is really against me" but argued that defendant was on "major antipsychotic medications" such as Depakote, Effexor, trazodone, and Risperdal during his pretrial detention. Counsel pointed to notes, attached to the supplemental petition, showing that defendant was "very depressed and suicidal," transferred to a psychiatric ward for protection of self and others, and placed in restraints. She also cited nursing notes that said "he feels like he's going to hurt somebody or he's going to kill himself."

¶ 70 The State replied that defendant being on psychotropic medication but showing no signs of unfitness before or during trial showed that the medication was working and rendered him fit.

¶ 71 The court granted the State's motion to dismiss on all claims. Regarding the video interview, the court noted that it had denied a pretrial motion to suppress arguing *Miranda* because it had found that defendant had been Mirandized, so the postconviction claim had already been litigated. The court denied the fitness hearing claim, acknowledging the records documenting defendant's "numerous medications" but finding that, between arrest and trial, he "was in front of me every month for all of those years and defense counsel nor the State never indicated to this Court that there was a bonafide doubt as to the defendant's fitness." Defendant's diagnoses were "depression, anxiety, and insomnia," and he never mentioned or argued his mental health in the pretrial or trial proceedings. The court saw "nothing in the medical records *** to suggest that he would have been found unfit" and found that he "has not shown that if he had had a clinical behavioral examination that he would have been found unfit." This appeal followed.

¶ 72                                    III. ANALYSIS

¶ 73 On appeal, defendant contends that the dismissal of his petition as supplemented was erroneous because it raised meritorious claims that (1) direct appeal counsel was ineffective for not raising trial counsel's ineffectiveness in not arguing that defendant's video statement should have been suppressed under *Seibert*, and (2) trial counsel was ineffective for not seeking a fitness hearing where defendant was oversedated before trial and thus unfit to stand trial.

¶ 74 When a defendant's postconviction petition is dismissed upon the State's motion, the issue on review is whether the petition and its supporting documentation made a substantial showing that the defendant was deprived of his or her constitutional rights. *People v. Dupree*, 2018 IL 122307, ¶ 28. All allegations in the petition that are not affirmatively refuted by the record are

accepted as true at the dismissal stage, so that credibility determinations are not allowed. *Id.* ¶ 29. The dismissal of a postconviction petition is reviewed *de novo*. *Id.*

On an ineffective assistance claim, a defendant must show that counsel's performance both (1) fell below an objective standard of reasonableness and (2) prejudiced the defendant; that is, that there is a reasonable probability that the result of the proceeding would have been different had counsel's performance not been deficient. *People v. Gayden*, 2020 IL 123505, ¶ 27.

### A. Motion to Suppress

Defendant first contends that direct appeal counsel was ineffective for not raising trial counsel's ineffectiveness in not arguing that defendant's video statement should be suppressed under *Seibert*.

The decision whether to file a motion to suppress evidence is generally a matter of trial strategy entitled to great deference, and a defendant shows ineffective assistance based on the failure to file such a motion if both (1) the unargued motion was meritorious and (2) a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed. *Id.* ¶ 28.

### 1. *Seibert*

*Seibert* was decided by a plurality of the United States Supreme Court, with one justice concurring in the judgment and four justices dissenting.[2] The plurality described the case thus:

> "This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda* \*\*\*, the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time. The question here is the admissibility of the repeated statement. Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible." *Seibert*, 542 U.S. at 604.

In other words, the Court was considering "[t]he technique of interrogating in successive, unwarned and warned phases," or "the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession," which the plurality referred to succinctly as "a question-first practice." *Id.* at 609-11.

The *Seibert* plurality found that, in light of the purpose of *Miranda* warnings to implement the constitutional privilege against self-incrimination and to reduce the risk of coerced confessions:

> "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could

---

[2]Specifically, Justice Breyer fully joined in the plurality and filed a concurrence, while Justice Kennedy concurred in the judgment as described below. See *supra* ¶ 84.

they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Id.* at 611-12.

The plurality concluded that "it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." *Id.* at 613. Question-first was based on a sensible assumption:

"[T]hat with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.*

A suspect could reasonably infer from being warned that anything he says can be used against him, absent clarification that the warning does not apply to what he already said but only what he says thereafter, "that what he has just said will be used, with subsequent silence being of no avail." *Id.*

¶ 82    The plurality distinguished question-first from the situation the Court found proper in *Oregon v. Elstad*, 470 U.S. 298 (1985). There, an officer in the midst of arresting a burglary suspect without Mirandizing him mentioned that he believed the suspect was involved and the suspect acknowledged being at the scene. At the police station, the suspect was Mirandized, interrogated, and confessed. The *Elstad* Court found that the arresting officer was not interrogating or coercing the suspect and his failure to Mirandize was an oversight, so that the Court was "treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally." *Seibert*, 542 U.S. at 615. *Elstad* rejected the "theory that any short, earlier admission, obtained in arguably innocent neglect of *Miranda*, determined the character of the later, warned confession." *Id.* (citing *Elstad*, 470 U.S. at 311-14).

"The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.*

¶ 83    In *Seibert*, police made a conscious decision not to Mirandize the suspect until after she answered questions (*id.* at 605-06), though the plurality noted that "the intent of the officer will rarely be as candidly admitted as it was here" so that "the focus is on facts apart from intent that show the question-first tactic at work" (*id.* at 616 n.6). The unwarned interrogation was conducted in the same room in the police station by the same officers as the later Mirandized interrogation, "was systematic, exhaustive, and managed with psychological skill," and only about 20 minutes separated the unwarned and Mirandized interrogations. *Id.* at 616. "Nothing

was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led [the suspect] through a systematic interrogation," and the "impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given" so that it "would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." *Id.* at 616-17. The plurality concluded that "[t]hese circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.* at 617.

¶ 84        Justice Kennedy, concurring in the judgment, expressed concern that the plurality's test "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations" while "I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 621-22 (Kennedy, J., concurring). Kennedy opined that "postwarning statements that are related to the substance of prewarning statements" as product of a "deliberate two-step strategy" may not be excluded if curative measures "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver" had been taken, such as "a substantial break in time and circumstances" that "allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn," or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.* at 622.

¶ 85                              2. Cases Applying *Seibert*

¶ 86        Our supreme court has addressed how Illinois courts should apply *Seibert*, finding Justice Kennedy's concurrence to be the controlling authority because it resolved the case on the narrowest grounds. *People v. Lopez*, 229 Ill. 2d 322, 360 (2008). Therefore, in evaluating a *Seibert* claim,

> "we must first determine whether the detectives deliberately used a question first, warn later technique when interrogating defendant. If there is no evidence to support a finding of deliberateness on the part of the detectives, our *Seibert* analysis ends. If there is evidence to support a finding of deliberateness, then we must consider whether curative measures were taken ***." *Id.* at 360-61.

Because "police officers will generally not admit on the record that they deliberately withheld *Miranda* warnings from a suspect in order to obtain a confession," deliberateness is determined based on subjective evidence such as police testimony but also objective evidence, such as the timing, setting, and completeness of the prewarning interrogation, and the continuity of police personnel and content between the prewarning and postwarning statements, that supports or refutes an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning. *Id.* at 361.

¶ 87        If the court determines that *Miranda* warnings were deliberately withheld to obtain a confession, then it considers "whether, after receiving midstream *Miranda* warnings, a reasonable person, in defendant's situation, would have understood that he retained a choice about continuing to talk to police." *Id.* at 364. Stated another way, it considers whether it would

have been reasonable for the defendant to regard the two interrogation sessions as parts of a continuum so that it would be unnatural to refuse to repeat at the second stage what he or she said in the first stage. *Id.* at 365. The relevant factors include "the passage of time between the unwarned and warned statements, the location where those statements were taken, whether the same person questioned the suspect during the unwarned and warned statements, whether details obtained during the unwarned phase were used during the warned phase, and whether the suspect was advised that the unwarned statement could not be used against the suspect." *Id.* at 364-65.

¶ 88    In *People v. Ayala*, 386 Ill. App. 3d 912, 918 (2008), a defendant contended that trial counsel was ineffective for failing to file a motion to suppress because the defendant spoke Spanish but made inculpatory statements to police after being Mirandized and questioned in English only. He contended that his subsequent videotaped statement beginning with *Miranda* warnings in Spanish should be suppressed under *Seibert* and *Lopez* because the police engaged in question-first, warn-later by obtaining an inculpatory statement before properly Mirandizing the defendant and then obtaining a similar statement after proper Mirandization. This court found that:

> "*Lopez* is not applicable here because this is not a case where the officers deliberately used a question first, warn later technique. Rather, as discussed above, defendant indicated to the officers at the scene that he understood English and he was given his *Miranda* warnings in English prior to his arrival at the police station. The *Miranda* warnings were repeated in Spanish prior to the giving of the videotaped statement. The officers did not act in a calculated way to undermine the *Miranda* warnings and, thus, defendant's post-*Miranda* statements were not subject to suppression." *Id.* at 919.

¶ 89                                          3. Stale *Miranda* Warnings
¶ 90    Our supreme court has addressed the issue of when and how *Miranda* warnings can become stale. "It should be made clear that once *Miranda*'s mandate was complied with at the threshold of the questioning it was not necessary to repeat the warnings at the beginning of each successive interview." *People v. Hill*, 39 Ill. 2d 125, 131-32 (1968). "Once an accused is advised of the *Miranda* warnings and acknowledges his understanding of them, the voluntariness of subsequent statements is not compromised by failure to repeat the warnings at each successive interview." *People v. Hobley*, 159 Ill. 2d 272, 294 (1994). It is axiomatic that " 'fresh *Miranda* warnings are not required after the passage of several hours,' " and it would be ridiculous to require police to Mirandize a suspect following each break in questioning. *People v. Degorski*, 382 Ill. App. 3d 135, 144 (2008) (quoting *People v. Garcia*, 165 Ill. 2d 409, 425 (1995)). New warnings are required only when warnings given in a previous interrogation are so stale and remote that a substantial possibility exists that the suspect was unaware of his or her constitutional rights when the later interrogation began. *Id.* A court determining whether a defendant understood his constitutional rights in post-*Miranda* warning interrogations must consider the totality of the circumstances. *Id.*

¶ 91                                                 4. Analysis
¶ 92    Here, the evidence from the hearing on the suppression motion filed by trial counsel, borne out at trial, was that detectives and an ASA Mirandized defendant multiple times during the

interview process before the videotaped statement at issue. Moreover, he did not give any statement that was inculpatory to any degree until after he was Mirandized. He was interviewed in Boyd's apartment and by Bohlen before he was Mirandized and did not give any inculpatory statements. However, he was not interviewed by El-Amin and did not first admit to stabbing Boyd and knowing where her body was until after he was Mirandized. The trial court found the testimony of the detectives and the ASA credible, expressly finding that defendant had been "given his *Miranda* warnings and that he voluntarily waived his *Miranda* warnings."

¶ 93        In *Degorski*, we rejected a *Seibert* claim similar to defendant's claim, where a defendant was Mirandized in the middle of a videotaped confession rather than at the beginning and the State allegedly engaged in question-first, warn-later interrogation. Because the *Degorski* "defendant received *Miranda* warnings in full on two occasions during previous interviews, the issue squarely presented before this court [was] whether the circuit court erred in ruling that [an ASA] was required to administer fresh *Miranda* warnings prior to commencing the videotaped statement." *Id.* at 143. "Seibert sought to exclude both her prewarning and postwarning statements because she was questioned first until she gave an inculpating statement and *then* advised of her fifth amendment rights prior to giving a second, redundant statement." (Emphasis added.) *Id.* at 147 (citing *Seibert*, 542 U.S. at 605). *Degorski* was distinguishable from *Seibert* at least in part because the *Degorski* defendant "was previously and properly advised of his constitutional rights which extended to his videotaped statement." *Id.* This case is also similar to *Ayala*: in both, the defendant contends that his statement should be suppressed under *Seibert* but the record belied the claim that the earlier statement was not properly warned and instead showed that he was admonished of and waived his *Miranda* rights before the allegedly unwarned statement. *Ayala*, 386 Ill. App. 3d at 918-19.

¶ 94        We conclude that a *Seibert* claim here was not meritorious and highly unlikely to succeed. The heart of a *Seibert* claim is not mere repetition of earlier statements after reading *Miranda* warnings but eliciting after Mirandization a suspect's repetition of un-Mirandized statements in an effort to render them admissible. However, trial counsel's motion to suppress already alleged that defendant's statements were un-Mirandized, and after an evidentiary hearing the trial court found otherwise. Adding a *Seibert* claim to the motion to suppress would not have changed that the trial court had rejected the crucial factual allegation underlying such a claim. Stated another way, the circuit court had ample evidence in the trial record to affirmatively refute the postconviction claim that defendant had a valid *Seibert* claim. Therefore, trial counsel was not ineffective for not raising a *Seibert* claim in his motion to suppress and appellate counsel was not ineffective for not contending that trial counsel was ineffective in that manner.

¶ 95                                      B. Fitness Hearing

¶ 96        Defendant also contends that trial counsel was ineffective for not seeking a fitness hearing when he was oversedated before trial and thus unfit to stand trial.

¶ 97        A defendant is entitled to a pretrial hearing to determine whether he or she is fit if a *bona fide* doubt of his or her fitness to stand trial or be sentenced is raised. *People v. Castellano*, 2020 IL App (1st) 170543, ¶ 45. A defendant is considered unfit if a mental or physical condition renders him or her unable to understand the nature and purpose of the proceedings against him or her or to assist in his or her defense. *Id.* While there are no fixed or immutable signs that invariably indicate the need for further inquiry into a defendant's fitness,

- 17 -

relevant factors in assessing whether a *bona fide* doubt of fitness exists include a defendant's irrational behavior, demeanor at trial, any prior medical opinion on competence to stand trial, and the representations of defense counsel concerning the competence of his or her client. *Id.* ¶ 46. Fitness concerns a person's ability to function within the context of a trial only and does not refer to competence in other areas; that is, a defendant who is able to cooperate with counsel and assist in his or her defense in a rational and reasonable matter is fit to stand trial even if he or she suffers mental illness or requires psychiatric treatment. *Id.* ¶ 49; *People v. Washington*, 2016 IL App (1st) 131198, ¶ 76.

> "Taking as true defendant's allegations that he suffers from mental impairments as they are stated in his post-conviction psychological assessments [citation], these allegations do not necessarily establish that defendant was unfit. [Citation.] The issue is whether defendant could understand the proceedings and cooperate with counsel." *People v. Harris*, 206 Ill. 2d 293, 305 (2002).

¶ 98 For a defendant to establish prejudice from trial counsel's alleged incompetency as part of an ineffective assistance claim, he or she must show that facts existed at the time of his or her trial that raised a *bona fide* doubt of his or her ability to understand the nature and purpose of the proceedings and to assist in his or her defense. *Castellano*, 2020 IL App (1st) 170543, ¶ 45. A postconviction petitioner raising such an ineffectiveness claim is entitled to relief only if he or she shows that the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing had it been informed of the evidence raised in his postconviction petition. *Id.*

¶ 99 Here, the trial court was aware in 2006, well before trial, that defendant had been diagnosed with anxiety, insomnia, and depression and was receiving psychotropic medication. While it was not aware of the details of his inpatient psychiatric treatment at the beginning of his time in jail from 2004 to near the end of 2005, it was aware that inpatient treatment had occurred during that time. Moreover, as the circuit court stated in dismissing the postconviction petition, no concerns about defendant's fitness were raised in the trial court proceedings. He testified coherently at the 2006 hearing on his motion to suppress and at another motion hearing, and he was responsive to questions during various court proceedings. We find no error in the circuit court finding no grounds for doubting defendant's fitness and thus no error in dismissing defendant's petition on this claim.

¶ 100                                    IV. CONCLUSION
¶ 101 Accordingly, the judgment of the circuit court is affirmed.

¶ 102 Affirmed.